1    **WO**

6         **IN THE UNITED STATES DISTRICT COURT**

7         **FOR THE DISTRICT OF ARIZONA**

9    Kevin Leibel, et al.,                    No. CV-18-01743-PHX-DWL

10             Plaintiffs,                     **ORDER**

11   v.

12   City of Buckeye, et al.,

13             Defendants.

        Pending before the Court is Defendants' motion to dismiss under Rule 12(b)(6).
(Doc. 16.)  As explained below, the motion will be granted in part and denied in part.[1]

                              **BACKGROUND**

A.   <u>The Incident</u>

        The complaint was filed on June 6, 2018 (Doc. 1) and re-filed on June 7, 2018 at
the direction of the Court (Doc. 7).[2]  The following summary assumes the truth of all
allegations contained therein.

        On July 19, 2017, C.L.—a 14-year-old boy with autism spectrum disorder—was
playing at a public park in Buckeye, Arizona.  (Doc. 7 ¶¶ 1, 13, 16, 17.)  C.L. was
"stimming" with a piece of string.  (*Id.* ¶ 21.)  "Stimming," or "self-stimulatory behavior,"
is the repetition of physical movements and sounds or the repetitive movement of objects.

---

[1]    Defendants have requested oral argument.  The Court will deny the request because
the issues have been fully briefed and oral argument will not aid the Court's decision.  *See*
Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

[2]    The original complaint improperly included a minor's name.  *See* Fed. R. Civ. P.
5.2(a)(3).

(*Id.* ¶ 22). Stimming is common in individuals with developmental disabilities, as it provides a sense of calm and helps them cope with their surroundings. (*Id.* ¶¶ 22, 23.) It is a well-known and common symptom of autism. (*Id.* ¶ 24.)

Defendant David Grossman ("Officer Grossman")—a police officer and drug recognition expert employed by the Buckeye Police Department—approached C.L. after seeing C.L. stimming. (*Id.* ¶¶ 9, 20, 25, 27, 29.) Officer Grossman claims that he mistook C.L.'s stimming for illegal drug use. (*Id.* ¶ 25.) Officer Grossman asked C.L. what he was doing. (*Id.* ¶ 33.) C.L. responded, "Me? Good." (*Id.* ¶ 34.) Grossman again asked C.L. what he was doing. (*Id.* ¶ 35.) C.L. answered, "I'm stimming." (*Id.* ¶ 36.) Officer Grossman responded, "What?" (*Id.* ¶ 37.) C.L. then stated, "I stim with this," as he held up a piece of string for Officer Grossman to see. (*Id.* ¶ 38.) Officer Grossman responded, "What is that?" and commanded C.L. to "stop walking away from me." (*Id.* ¶ 39.)

C.L. stopped walking and answered, "It's a string," and again held the string up for Officer Grossman to see. (*Id.* ¶ 40.) Officer Grossman then responded, "Ok. So why are you bouncing around that way," and asked C.L. if "he had any ID on him." (*Id.* ¶ 41.) C.L. answered, "No" and turned to leave. (*Id.* ¶ 49.) Officer Grossman immediately grabbed C.L.'s right wrist and began bending C.L.'s right arm behind C.L.'s back, telling him: "Don't go anywhere." (*Id.* ¶ 50.) Officer Grossman then grabbed both of C.L.'s arms, forced them behind C.L.'s back, and began to handcuff him. (*Id.* ¶ 51.) C.L. began screaming and tried to move away from Officer Grossman. (*Id.* ¶ 52.)

C.L.'s reaction was predictable, given that people with autism often have hypersensitivity to sounds or touch, a condition known as tactory or sensory defensiveness. (*Id.* ¶ 53.) Even a slight touch can cause those with autism to suffer great anxiety, discomfort, and even physical pain. (*Id.*)

Officer Grossman then slammed C.L. against a tree, wrestled him to the ground, and pinned C.L. with his full body weight. (*Id.* ¶ 56.) C.L. continued to scream, repeatedly saying to himself, "I'm ok, I'm ok." (*Id.* ¶ 57.) C.L. then told Officer Grossman, "I need help," and "I can't breathe." (*Id.* ¶ 58.) Officer Grossman asked, "Why are you acting like

this, C.L.?" (*Id.* ¶ 59.)

At this point, C.L.'s caregiver, Ms. Craglow, arrived at the park after running errands and informed Officer Grossman that C.L. is autistic. (*Id.* ¶ 60.) Initially, Officer Grossman ignored the statement and told Ms. Craglow that C.L. was "doing something with his hands." (*Id.* ¶ 61.) Ms. Craglow explained, "He's stimming," to which Officer Grossman responded "Yeah. I don't know what that is." (*Id.* ¶¶ 61, 62.) Ms. Craglow further explained, "It's when you have autism. It's his nerves." (*Id.* ¶ 63.) Officer Grossman uttered, "Uh huh, okay," and, despite the explanation, continued to pin C.L. to the ground with his full body weight. (*Id.* ¶ 64.) Ms. Craglow then informed Officer Grossman that C.L.'s hand was "turning white." (*Id.* ¶ 67.) Officer Grossman continued to hold down C.L. forcefully. (*Id.* ¶ 68.)

When another officer arrived on the scene, Officer Grossman allowed C.L. to get off the ground and sit with Ms. Craglow. (*Id.* ¶¶ 70, 71.) Officer Grossman told the other officer that he had detained C.L. because C.L. "started backing away from me while I was identifying him and trying to figure out what was in his hand." (*Id.* ¶ 71.)

C.L. suffered significant injuries resulting from his encounter with Officer Grossman. (*Id.* ¶ 73.) He suffered scratches, cuts, and bruises to his face, back, and arms and a serious ankle injury that has required numerous draining procedures with a heavy gauge needle as well as a surgical intervention. (*Id.* ¶¶ 74, 75.) C.L. also suffered emotional damage. (*Id.* ¶¶ 77-80.)

B.    Post-Incident Conduct

Following the incident, C.L.'s parents filed a complaint against Officer Grossman with the Buckeye Police Department ("BPD"). (*Id.* ¶ 83.) In response, the BPD admitted that Officer Grossman "has not been trained in handling special needs people or mentally ill persons." (*Id.* ¶ 84.) Nevertheless, the BPD concluded that Officer Grossman "acted within the law and did not abuse his power as a sworn officer and was not negligent as an officer during this incident." (*Id.* ¶ 85.)

In a press conference following the incident, the BPD justified Officer Grossman's

actions as those of "an officer who encountered a subject who was displaying behavior that he believed may have been of a subject who was under the influence of an inhalant." (*Id.* ¶ 86.) In that same press conference, the BPD stated that Officer Grossman's actions were justified because Officer Grossman "had reasonable suspicion" to "detain the juvenile" and "the juvenile began to walk away." (*Id.*) The BPD made those statements despite knowing that C.L. had twice showed Officer Grossman the piece of string in his hand and had informed Officer Grossman that he was "stimming." (*Id.*)

The BPD didn't discipline Officer Grossman despite his track record of past misconduct. (*Id.* ¶¶ 87-89.) Officer Grossman had been disciplined at least four times in the seven years preceding the incident, including for illegally arresting a suspect, filing false reports, failing to act, and abandoning his duty as a police officer. (*Id.* ¶¶ 89-94.) In addition to those events, the BPD also knew that Officer Grossman had in the past (1) deployed excessive force without legal justification, (2) seized "brass knuckles" despite them not being illegal, (3) written defective police reports, and (4) engaged in reckless driving. (*Id.* ¶¶ 95-99.)

Officer Grossman's supervisors—Lieutenant Charles Arlak ("Lieutenant Arlak") and Chief of Police Larry Hall ("Chief Hall")—have enabled Officer Grossman's illegal behavior by actively protecting him and minimizing and covering up his illegal behavior. (*Id.* ¶ 101.) Lieutenant Arlak is Officer Grossman's brother-in-law and is a close friend of Chief Hall. (*Id.* ¶ 102.) Certain BPD officers have overheard Lieutenant Arlak saying that he needs to "protect" Officer Grossman because of repeated illegal conduct. (*Id.* ¶ 104.) Lieutenant Arlak has also ordered other members of the BPD to "quit targeting" Officer Grossman. (*Id.* ¶ 105.) Chief Hall has "targeted" supervisors who have attempted to discipline Officer Grossman for past illegal conduct. (*Id.* ¶ 109.) Additionally, Chief Hall ordered the BPD to defend Officer Grossman in press conferences, such as the one occurring after the incident with C.L. (*Id.* ¶ 140.) BPD employees have voiced their concerns to Buckeye City Manager Roger Klingler, but nothing has been done to address the conduct of Officer Grossman, Lieutenant Arlak, or Chief Hall. (*Id.* ¶¶ 112, 113.)

C. <u>The Complaint</u>

The complaint names four defendants: the City of Buckeye ("City"), Officer Grossman, Lieutenant Arlak, and Chief Hall (collectively, "Defendants"). (Doc. 7.)[3] Officer Grossman, Lieutenant Arlak, and Chief Hall are named in their individual and official capacities. The complaint alleges nine causes of action. Causes I through IV arise under 42 U.S.C. § 1983 and/or *Monell*: (I) false arrest; (II) use of excessive force; (III) failure to train and/or supervise; and (IV) ratification of unconstitutional conduct. Causes V and VI arise under the Americans with Disabilities Act for (V) wrongful arrest and (VI) failure to accommodate. Causes VII through IX arise under state law: (VII) battery; (VIII) negligence; and (IX) negligent training and supervision.

On June 21, 2018, the Court appointed C.L.'s parents, Kevin and Danielle Leibel, as his guardians ad litem. (Doc. 10.)

On August 9, 2018, Defendants moved to dismiss for failure to state a claim under Rule 12(b)(6). (Doc. 16.)

**DISCUSSION**

A. <u>Legal Standard</u>

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett*

---

[3]     The complaint identified a fifth defendant, the BPD, but this defendant was later dismissed by stipulation of the parties. (Doc. 20.)

*v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

B.     Analysis

Defendants argue that each Defendant named in his individual capacity is entitled to qualified immunity for claims arising under § 1983.  Specifically, Defendants argue Officer Grossman is entitled to qualified immunity on Cause I (False Arrest) and Cause II (Use of Excessive Force) and Lieutenant Arlak and Chief Hall are entitled to qualified immunity on Cause III (Failure to Train and/or Supervise) and Cause IV (Ratification of Unconstitutional Conduct).

Qualified immunity is "'an immunity from suit rather than a mere defense to liability.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  It should, thus, be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

1.     **Federal Claims**

*Cause I: False Arrest*

Defendants argue Officer Grossman is entitled to qualified immunity on Cause I because his actions, as alleged in the complaint, "do not violate the Fourth Amendment, much less clearly established constitutional law."  (Doc. 16 at 5-8.)  First, Defendants contend the facts as pleaded don't show that Officer Grossman arrested C.L.  Instead, Defendants argue, Officer Grossman engaged in a lawful investigatory stop, supported by reasonable suspicion, which wasn't converted into an arrest when Officer Grossman restrained C.L. after he attempted to flee.  (*Id.*)

C.L. responds that he was arrested by Officer Grossman because "[a]n arrest is complete when the suspect's liberty of movement is interrupted and restricted by the police." (Doc. 21 at 4-6.)  Additionally, C.L. claims his arrest was unsupported by probable cause, because after showing Officer Grossman he had a string in his hand, "a reasonably

prudent person would have perceived that C.L. was disabled, and likewise would have known that C.L. was not holding drugs or contraband in his hand." (*Id.*) Finally, C.L. argues that Officer Grossman isn't entitled to qualified immunity because "[i]t is well established that 'an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983.'" (*Id.*)

The Court finds that the facts alleged in the complaint, construed in the light most favorable to C.L., demonstrate that Officer Grossman arrested C.L. without probable cause and thus violated C.L.'s clearly-established constitutional rights. Thus, Officer Grossman is not entitled to qualified immunity on Cause I at this early stage of litigation.

First, C.L. states a plausible claim that Officer Grossman converted the initial investigatory stop into an arrest. Whether an investigatory stop becomes an arrest is a fact-specific inquiry that turns upon "the totality of the circumstances." *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014). First, the Court considers "'the intrusiveness of the stop, *i.e.,* the aggressiveness of the police methods and how much the plaintiff's liberty was restricted.'" *Id.* (citation omitted). When conducting this inquiry, the Court must "'review the situation from the perspective of the person seized,' assessing whether 'a reasonable innocent person in these circumstances would . . . have felt free to leave after brief questioning.'" *Id.* (citation omitted). Second, the Court considers "'the justification for the use of such tactics, *i.e.,* whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken.'" *Id.* (citation omitted). Because these inquiries are fact-specific, they are "often left to the determination of a jury." *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014).

A reasonable jury could conclude, based on the facts alleged, that Officer Grossman arrested C.L. First, the intrusiveness of the stop cuts in favor of an arrest finding. C.L. alleges that Officer Grossman "grabbed [C.L]'s right wrist and began bending [C.L.]'s right arm behind [C.L.]'s back, telling him: 'Don't go anywhere.'" (Doc. 7 ¶ 50.) Officer Grossman then "grab[bed] both of [C.L.]'s arms, forced them behind [C.L.]'s back, and began to handcuff [C.L.]." (*Id.* ¶ 51.) Officer Grossman then "slammed [C.L.] against a

nearby tree and wrestled him to the ground, pinning [C.L.] down with his full body weight." (*Id.* ¶ 56.)  Officer Grossman "remained on top of [C.L.], continuing to pin him down with his full body weight" until another officer arrived.  (*Id.* ¶¶ 64, 70.)  This was at least a moderately significant restriction of C.L.'s liberty, and a reasonable innocent person wouldn't have felt free to leave under the circumstances. *Cf. United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop.").

Second, the lack of justification for this level of force also cuts in favor of an arrest finding.  This is not a case where Officer Grossman had reason to believe C.L. was armed and dangerous or had just committed a violent crime.  *Compare Edwards*, 761 F.3d at 982 (citation omitted) ("'[W]here the police have information that the suspect is currently armed or the stop closely follows a violent crime . . . holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest.'").  To the contrary, Officer Grossman initiated the encounter simply because he suspected C.L. might be under the influence of drugs.  Moreover, before any force was employed, C.L. explained to Officer Grossman that he was stimming with a piece of string and showed the string to Officer Grossman.  (Doc. 7 ¶¶ 36-40.)  Because, as alleged, Officer Grossman saw that C.L. was not holding drugs or contraband in his hands, C.L. has plausibly alleged that Officer Grossman lacked probable cause to arrest him.  Therefore, at this stage of litigation, Officer Grossman is not entitled to qualified immunity because it is clearly established that "an arrest without probable cause violates the Fourth Amendment." *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988).

*Cause II: Excessive Force*

Defendants argue that Officer Grossman is entitled to qualified immunity on Cause II: Excessive Force.  (Doc. 16 at 5-9.)  Defendants contend that Officer Grossman's "use of force occurred only after C.L. attempted to leave the site of the investigation and, even then, was limited to the force necessary to maintain his physical presence at the scene, and overcome his flight and resistance."  (Doc. 16 at 9.)  Defendants thus argue the use of force

was "neither unconstitutional, nor a violation of clearly established law." (*Id.*)

C.L. argues that Officer "Grossman's use of force was not 'objectively reasonably in light of the facts and circumstances' confronting him" and that, because C.L. was only playing with a piece of string in the park, Officer "Grossman's intrusion on C.L.'s Fourth Amendment rights was significant and there was no legitimate government interest at stake." (Doc. 21 at 6-7.)

When determining whether a use of force is excessive for Fourth Amendment purposes, the question is whether the force was "'objectively reasonable in light of the facts and circumstances confronting' the . . . officers." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (citation omitted). The "reasonableness" inquiry "requires careful attention to the facts and circumstances of each particular case," including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Kisela v. Hughes*, 138 S.Ct 1148, 1152 (2018) (citation omitted). Additionally, the law is well established in the Ninth Circuit that "where it is or should be apparent to the officers that the individual involved is emotionally disturbed [or mentally ill], that is a factor that must be considered in determining . . . the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). "Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) (citations omitted).

C.L. has pleaded facts sufficient to survive a motion to dismiss. Applying the test used by the Ninth Circuit, a reasonable jury could conclude that Officer Grossman used excessive force. The first two factors of that test—the severity of the crime and whether the suspect posed an immediate threat—strongly favor C.L. Officer Grossman initiated the encounter because he suspected C.L., who was standing by himself in a park, was engaged in "illegal drug use." (Doc. 7 ¶ 25.) This is not the crime of the century. Moreover, C.L. immediately explained to Officer Grossman that he was stimming and

showed Officer Grossman the piece of string that was in his hand.  Yet after receiving this innocuous explanation, Officer Grossman "handcuff[ed] C.L., slam[med] him against a tree, tackle[d] him to the ground, and forcefully pin[ned] him down until backup arrived." (Doc. 21 at 6 (citing Doc. 7 ¶¶ 50-71).)  C.L. also alleges that his hand "turned white" from Officer Grossman restraining him.  (*Id.*)

Only the last factor—"whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight"—could weigh in Defendants' favor.  But even then, the complaint only alleges that C.L. "turned to leave," not that he began running away or fought Officer Grossman.  (Doc. 7 ¶ 49.)  It also bears noting that C.L. was only 14 years old at the time of this incident.

For these reasons, a reasonable jury could conclude the physical force exerted against C.L. was excessive.  Because the right to be free from excessive force is clearly established, Officer Grossman is not, at this juncture, entitled to qualified immunity related to Cause II.

*Cause III: Failure to Train and/or Supervise*

Lieutenant Arlak and Chief Hall move to dismiss Cause III because a failure to train or supervise employees "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," which typically requires "[a] pattern of similar constitutional violations by untrained employees."  (Doc. 16 at 10.) Defendants argue that "[t]here are no allegations that Lieutenant Arlak or Chief Hall directly supervised Officer Grossman, had any direct responsibility for his training, or were aware of a need to train or supervise Officer Grossman on dealing with autistic persons and were then deliberately indifferent to a need to train or supervise in that 'relevant respect.'" (*Id.* at 11.)

C.L. counters that the complaint "contains detailed allegations regarding Grossman's long history of illegal actions, conduct, and behavior" and that Lieutenant Arlak and Chief Hall "actively protect[ed] Grossman, minimizing and covering-up Grossman's illegal behavior."  (Doc. 21 at 7-9.)

To assert a § 1983 claim against Lieutenant Arlak and Chief Hall, C.L. must show the "personal participation" of each defendant. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). In this instance, C.L. alleges that Lieutenant Arlak and Chief Hall failed to properly train and supervise Officer Grossman. (Doc. 7¶¶ 131-133.)

"A failure to train or supervise can amount to a 'policy or custom' sufficient to impose [§ 1983] liability . . . ." *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-90 (1989)). To be actionable, the failure to train or supervise must amount to "deliberate indifference to the rights of persons with whom those employees are likely to come into contact." *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (citation and internal quotation marks omitted). There must be a "direct causal link" between the failure to train or supervise and the injury suffered by the plaintiff. *Anderson*, 451 F.3d at 1070.

C.L. has not stated a plausible claim that Lieutenant Arlak and Chief Hall should have been aware Officer Grossman would commit the type of constitutional violation he is alleged to have committed. "A pattern of *similar* constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citation omitted) (emphasis added). Although C.L. identifies various types of misconduct that Officer Grossman allegedly committed (Doc. 7 ¶¶ 90-99), none of these allegations concerns mistreatment of an individual with a disability, and only one concerns an arrest without probable cause and use of excessive force. (Doc. 7 ¶ 96). In that latter instance, Officer Grossman was specifically admonished. (*Id.*) Consequently, C.L. has failed to allege a plausible claim that Lieutenant Arlak and Chief Hall failed to train or supervise Officer Grossman in a manner that would trigger liability under § 1983. And because C.L. hasn't alleged a constitutional violation, Lieutenant Arlak and Chief Hall are entitled to qualified immunity on Cause III.

C.L. similarly fails to allege that the City is liable under § 1983 for failing to train or supervise Officer Grossman. C.L. asserts the City failed to "enforce proper and adequate

- 11 -

training and supervision on interacting and dealing with individuals with disabilities . . . ." (Doc. 7 ¶ 125.)  But C.L. identifies no other instances where the City violated the rights of disabled individuals.  Because C.L. has not alleged a pre-existing pattern of violations, C.L. has not stated a claim for failure to train or supervise against the City.[4]  Therefore, Cause III is dismissed.

### Cause IV: Ratification of Unconstitutional Conduct

Defendants argue that Lieutenant Arlak and Chief Hall are entitled to qualified immunity on Cause IV: Ratification of Unconstitutional Conduct.  First, Defendants claim that ratification is a theory of municipal liability, "not a basis to impose individual liability on a supervisor."  (Doc. 16 at 11.)  Moreover, Defendants argue that C.L.'s allegations "do not show that Lieutenant Arlak or Chief Hall, individually, said or did anything deliberately to endorse unconstitutional behavior" and that solely failing to discipline Officer Grossman is insufficient to show ratification.  (*Id.* at 12.)

C.L argues that "[a] supervisor's subsequent 'ratification' of another's conduct can form the basis for liability under § 1983."  (Doc. 21 at 9.)  C.L. also argues that ratification occurred when Lieutenant Arlak and Chief Hall "approv[ed] of Grossman's actions, clear[ed] him of any improper conduct, fail[ed] to impose meaningful discipline, and order[ed] the BPD to defend Grossman in press conferences after C.L.'s illegal arrest." (*Id.* at 10.)  Further, C.L. contends that ratification was demonstrated by Lieutenant Arlak and Chief Hall's "active protection of Grossman and their orders to other supervisors to 'quit targeting' Grossman when these supervisors attempted to impose discipline on him." (*Id.*)

As an initial matter, ratification of unconstitutional conduct appears to be both a theory of municipal and individual liability under § 1983.  *Larez v. City of Los Angeles,*

---

[4] This is not a "rare" circumstance in which "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Connick*, 563 U.S. at 64.  For instance, this is not like the hypothetical posed by the Supreme Court in *Canton* where a city arms its police force with firearms to capture fleeing felons without training the officers on the constitutional limitations on the use of deadly force.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989).

946 F.2d 630, 645-648 (9th Cir. 1991). In *Larez*, the Ninth Circuit found it was not plain error where the jury held a police chief individually liable under § 1983 for "ratifying" an employee's conduct. *Id.* at 646.

Nevertheless, supervisory ratification can only form the basis for § 1983 liability "[i]n limited circumstances. . . . Importantly, the circumstances of the ratification must also demonstrate that the supervisor had previously set in motion acts of others which caused the others to inflict a constitutional injury." *Peschel v. City of Missoula*, 686 F. Supp. 2d 1092, 1102 (D. Mont. 2009) (citing *Larez*, 946 F.2d at 645-46). As discussed in the preceding section, Lieutenant Arlak and Chief Hall can't plausibly be accused of "setting in motion" the constitutional violations that Officer Grossman allegedly committed against C.L.—there is no allegation of prior incidents involving the mistreatment of individuals with disabilities. Nor are Lieutenant Arlak or Chief Hall accused of enacting policies that encouraged unlawful arrests or the use of excessive force. Accordingly, they can't be held liable for those violations under a "ratification" theory simply because they declined to discipline Officer Grossman and directed others to defend Officer Grossman during a post-incident press conference. *Hunt v. Davis*, 2018 WL 4405456, *1-2 (9th Cir. 2018) ("The complaint alleges that, following Sheriff Clark's review of his department's investigations into Hunt, Sheriff Clark made two statements generally standing by and commending his department's work. . . . Such post-incident statements alone do not amount to a claim for individual liability by acquiescence. . . . [N]either the Supreme Court nor our circuit has established that an official's post-incident ratification of or acquiescence to a claimed constitutional violation is alone sufficient for individual liability under § 1983.").

### Cause V: ADA (Wrongful Arrest)

Cause V of the complaint asserts a claim for wrongful arrest, in violation of the Americans with Disabilities Act, against two defendants: Officer Grossman and the City. (Doc. 7 at 3.) Defendants argue, as a threshold matter, that Officer Grossman should be dismissed as a defendant because he is "an individual police officer, . . . not a 'public

entity,'" is thus not a proper ADA defendant. (Doc. 16 at 15.) Defendants also argue that the claim generally fails because C.L. "does not plead disability with the requisite factual specificity." (*Id.* at 15 n.1.) Last, Defendants contend there can be no ADA-based claim when use of force against a disabled person "occurs as a result of that person's actions, which justify the law enforcement response[.]" (*Id.* at 16.)

In response, C.L. argues that because he has sued Officer Grossman "[i]n his official capacity," his claim against Officer Grossman qualifies as a claim against a "public entity" within the meaning of the ADA. (Doc. 21 at 12-13.) C.L. also contends that he has alleged his disability with specificity, pointing to, among other things, the allegations that autism "substantially limits one or more of C.L.'s major life activities, including caring for himself, performing manual tasks, learning, concentrating, communicating, and interacting with others." (*Id.* at 13 (quoting Doc. 7 ¶ 148).) Finally, C.L. argues that he has stated a plausible claim under the ADA because Officer Grossman "arrested C.L. because of conduct related to C.L.'s disability," specifically, by "mistaking C.L.'s 'stimming' for drug use." (Doc. 21 at 13.)

As an initial matter, the Court agrees with Defendants that the claim against Officer Grossman should be dismissed. "The term public entity [as used in the ADA] does not include individuals." *Voiles v. Reavis*, 2014 WL 5092664, *15 (S.D. Cal. 2014) (citations omitted). Here, C.L. tries to sidestep this principle by arguing that his claim against Officer Grossman is an official-capacity claim that's tantamount to a public-entity claim against the City. The difficulty with this approach is that C.L.'s complaint already asserts a ADA wrongful-arrest claim against the City. The presence of this claim means that his official-capacity claim against Officer Grossman is duplicative. *Coles v. Goord*, 2002 WL 31640544, *3 (N.D.N.Y. 2002) ("[S]ince Coles can assert his [ADA] claim against the Department of Correctional Services directly, there is no justification for allowing Coles to assert claims against the [individual] defendants in their official capacity.").

As for the claim against the City, the Court concludes C.L. has pleaded his disability with sufficient factual specificity. When a party alleges disability under the ADA, "courts

have generally required the party to plead the disability with some factual specificity." *Bresaz v. Cty. of Santa Clara*, 136 F. Supp. 3d 1125, 1135-36 (N.D. Cal. 2015) (citation omitted). It is typically sufficient to allege that the plaintiff "suffered from a specific, recognized mental or physical illness." *Id.* at 1136. Here, C.L. alleges that he has "autism spectrum disorder," which the National Institute of Mental Health recognizes as "a developmental disorder that affects communication and behavior." (Doc. 7 ¶¶ 13, 14.) Further, C.L. alleges "people with autism have difficulty communicating and interacting with others, restricted interests and repetitive behaviors, and symptoms that impair the person's ability to function properly in school, work, and other areas of life." (*Id.* ¶ 15.) These allegations are sufficient to show that C.L. has a disability recognized by the ADA.

C.L. also has stated a plausible claim that he was wrongfully arrested due to his disability. Title II of the ADA "applies to arrests." *Sheehan v. City and Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014). Title II is violated "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity." *Id.*

"To prevail on a theory of wrongful arrest under the ADA, [C.L.] must prove that (1) he was disabled; (2) [Officer Grossman] knew or should have known he was disabled; and (3) [Officer Grossman] arrested him because of legal conduct related to his disability." *Lawman v. City and Cty. of San Francisco*, 159 F. Supp. 3d 1130, 1147 (N.D. Cal. 2016) (citations omitted). As explained above, C.L. has pleaded sufficient facts to conclude he has a disability under the ADA, which satisfies the first factor. The second factor is also satisfied. C.L. alleges that he told Officer Grossman "I stim with this" while holding a piece of string. (Doc. 7 ¶ 38.) A reasonable jury could conclude that Officer Grossman "should have known" C.L. was disabled. Finally, a reasonable jury could conclude the encounter constituted an arrest, not a mere *Terry* stop, and that the arrest was because of C.L's disability—specifically, that Officer Grossman arrested C.L. because he misperceived C.L.'s stimming, an effect of his disability, as criminal activity. This case is thus distinguishable from *Bates ex rel. Johns v. Chesterfield Cty., Va.*, 216 F.3d 367 (4th

Cir. 2000), on which Defendants rely, because the plaintiff in that case "was arrested because there was probable cause to believe that he assaulted a police officer. Thus, the stop, the use of force, and the arrest of Bates were not by reason of Bates' disability, but because of Bates' objectively verifiable misconduct." *Id.* at 373. Here, in contrast, the complaint alleges that Officer Grossman initiated the arrest sequence because he saw C.L. "stimming"—which is directly attributable to his autism (and hardly "objectively verifiable misconduct").

### Cause VI: ADA (Failure to Accommodate)

In addition to asserting an ADA-based claim against Officer Grossman and the City for wrongful arrest, C.L. also asserts an ADA-based claim for failure to accommodate. (Doc. 7 at ¶¶ 156-166.) Defendants again argue, as a threshold matter, that Officer Grossman should be dismissed as a defendant because he's not a public entity. (Doc. 16 at 15.) They further contend the claim should be dismissed because "there are no plausible facts to show Grossman's actions in briefly holding C.L. until back-up arrived were 'by reason of his disability,' or were a different response than other, similarly-situated arrestees would face." (*Id.* at 16-17.) Last, they contend "there are no allegations plausibly suggesting an accommodation was even requested, and denied, at that point." (*Id.*)

C.L. argues in response that Officer Grossman, after being told that C.L. was autistic, "continued to forcefully pin C.L. down, to the point that C.L.'s hand was 'turning white.'" (Doc. 21 at 14 (citing Doc. 7 ¶¶ 63, 67, 68).) C.L. contends by not accommodating him after being informed he was autistic, Officer Grossman violated the ADA.

The Court concludes that C.L. hasn't alleged a plausible failure-to-accommodate claim and will thus dismiss Cause VI. It bears emphasizing that C.L.'s claims in Causes V and VI are alternative claims. Cause V is a claim for wrongful arrest, yet under Ninth Circuit law, Cause VI—the failure-to-accommodate claim—will lie only if the original decision to conduct the arrest was lawful. *Sheehan*, 743 F.3d at 1232 (a claim for reasonable accommodation arises "where, *although police properly investigate and arrest a person with a disability for a crime unrelated to that disability*, they fail to reasonably

- 16 -

accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees") (emphasis added). Here, once Officer Grossman made the decision to arrest C.L.—a decision that, again, for purposes of Cause VI, the Court must assume was proper and lawful—he was entitled to use some degree of physical coercion to complete the arrest sequence. *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Although C.L.'s condition may render him more sensitive to physical force than others, C.L. has not identified any authority suggesting a police officer must—to avoid liability under the ADA—refrain from using any force if he learns (or comes to suspect) the person he's in the process of lawfully arresting is autistic. Such a conclusion would be difficult to reconcile with *Graham*.

This case is also dissimilar to *Sheehan*. There, police responded to a report that a mentally-ill resident of a group home had a knife and was making threats toward others. 743 F.3d at 1217-20. By the time the police arrived, the home had been evacuated. *Id.* The woman initially brandished the knife toward the officers, but she then retreated to her private room. *Id.* Although "the situation had been defused sufficiently" at this point "to afford the officers an opportunity to wait for backup and to employ less confrontational tactics," they decided to enter her room and ending up shooting her. *Id.* at 1220, 1233. The Ninth Circuit concluded that, under these facts, the plaintiff had stated a valid claim under the ADA "that the officers failed to reasonably accommodate her disability by forcing their way back into her room without taking her mental illness into account and without employing tactics that would have been likely to resolve the situation without injury to herself or others." *Id.* at 1232. Here, in contrast, soon after C.L.'s caregiver arrived and explained the situation to Officer Grossman, C.L. was released from custody. Any injuries he may have suffered were the result of Officer Grossman's decision to arrest him, not from Officer Grossman's failure to accommodate his condition after the lawful arrest was

completed and the situation was defused.

### 2. **State-Law Claims**

*Notice-of-Claim Statute*

Under Arizona law, a party seeking to bring a claim against a public employee or entity must file a "notice of claim" with that employee or entity within 180 days of the action accruing. A.R.S. § 12-821.01(A). "If a notice of claim is not properly filed within the statutory time limit, a plaintiff's claim is barred by statute." *Falcon ex rel. Sandoval v. Maricopa Cty.*, 144 P.3d 1254, 1256 (Ariz. 2006) (en banc). "Actual notice and substantial compliance do not excuse failure to comply with the statutory requirements of A.R.S. § 12-821.01(A)." *Id.* at 1256.

Here, Defendants argue that C.L.'s state-law claims against the City[5] must be dismissed because (1) he attempted to serve his notice of claim by mail, which isn't a permissible service method under Arizona law in the absence of judicial approval (which he didn't obtain) and (2) he hasn't, in any event, shown the City ever received his mailing. (Doc. 16 at 17; Doc. 22 at 11-12.) In response, C.L. argues that the Arizona Supreme Court authorized service by mail against governmental entities in *Lee v. State*, 182 P.3d 1169 (Ariz. 2008), and has provided receipts showing that the notices were sent via certified mail. (Doc. 21 at 15-16.)

Defendants' arguments on these points are unavailing. First, the Court rejects Defendants' narrow interpretation of *Lee*. The Arizona Supreme Court didn't, as Defendants suggest (Doc. 22 at 11), simply accept the parties' stipulation in that case that service-by-mail would be an acceptable form of service—it went further and held, after identifying the relevant provisions of the Arizona Rules of Civil Procedure, that "[t]he rules do not prohibit mail as a form of filing. . . ." 182 P.3d at 1172. *See also Kenney v. City of Mesa*, 2012 WL 5499424, *6 n.9 (Ariz. Ct. App. 2012) (noting that personal delivery is

---

[5] Defendants do not seek dismissal of the state-law claims against Officer Grossman, Lieutenant Arlak, or Chief Hall on this basis. (Doc. 16 at 17 ["[T]he City of Buckeye is entitled to strict compliance with [the notice of claim statute] . . . . The City must be dismissed if Plaintiff cannot show that compliance."].)

only required in the case of "individuals, not governmental subdivisions," and that "the Arizona Supreme Court has already held that service of notices of claim may be accomplished by regular mail delivery" in the case of governmental subdivisions). Thus, it was permissible for C.L. to use the mail to serve his notice of claim on the City.

Second, the City also isn't entitled to dismissal, at this juncture, based on its assertion that it never received C.L.'s mailing. In *Lee*, the Arizona Supreme Court held that "[i]f a claimant presents proof of proper mailing—timely sent, correctly addressed, and postage paid—and the public entity denies receipt, it is for the factfinder to determine if the claim was in fact received within the statutory deadline." 182 P.3d at 1173. Here, C.L. has provided a certified mail receipt, addressed to the City Clerk at Town Hall, sent on January 9, 2018, with postage paid, along with proof of delivery. (Doc. 21-1.)

*Cause VII: Battery*

Defendants argue the complaint hasn't plausibly alleged that Officer Grossman's use of force constituted prohibited police conduct. (Doc. 16 at 17.) C.L. responds that the complaint shows Officer Grossman's actions did not "represent a proper law enforcement response." (Doc. 21 at 15.)

The Court finds that C.L. has plausibly alleged a claim for battery. "The elements of common law battery consist of an intentional act by one person that 'results in harmful or offensive contact with the person of another. . . .'" *Rice v. Brakel*, 310 P.3d 16, 19 (Ariz. Ct. App. 2013). C.L. alleges Officer Grossman intentionally "handcuff[ed] C.L., slam[med] him against a tree, tackle[d] him to the ground, and forcefully pin[ned] him down until backup arrived." (Doc. 21 at 6 (citing Doc. 7 ¶¶ 50-71).) C.L. also alleges he suffered injuries resulting from the use of force. Just as C.L. plausibly alleges in Cause II that Officer Grossman used excessive force, C.L. plausibly alleges in Cause VII that Officer Grossman's use of force was not justified under state law.

*Cause VIII: Negligence*

The complaint alleges that Officer Grossman and the City had a duty to use reasonable care when: (1) "interacting with . . . a person with autism," (2) "determining

whether reasonable suspicion or probable cause existed to detain and arrest a person with autism," (3) "performing an arrest on a person with autism without resorting to unnecessary and excessive force," and (4) "after detaining a disabled person, continuing to use force against that person." (Doc. 7 ¶174.) The complaint further alleges that Officer Grossman and the City "breached their duty of care and caused harm to [C.L.], including physical pain and suffering, terror, mental anguish, humiliation, degradation, damage to reputation, and financial loss." (*Id.* ¶ 175.)

In their motion, Defendants cursorily argue this claim should be dismissed because "Officer Grossman's alleged actions represent a proper law enforcement response" and "Plaintiffs have failed to plausibly show conduct falling below any identified law enforcement standard of care" (*see* Doc. 16 at 17), and C.L. responds that the allegations are sufficient to state a claim for negligence (*see* Doc. 21 at 15). After Defendants filed their motion, however, the Arizona Supreme Court held in *Ryan v. Napier*, 425 P.3d 230 (Ariz. 2018), that the "negligent use of intentionally inflicted force" is not "a cognizable claim" and that "an intentional act," such as effectuating an arrest or detaining a suspect, "cannot also constitute negligence." *Id.* at 236-37. In their reply, Defendants cite *Ryan* and argue that it renders Cause VIII "no longer viable" "as a matter of law." (Doc. 22 at 11.)

The Court agrees with Defendants' interpretation of *Ryan*. Cause VIII focuses solely upon Officer Grossman's intentional acts of applying force to C.L. (The complaint's theories of negligent training and supervision are asserted in a different count.) Accordingly, Cause VIII must be dismissed.

*Cause IX: Negligent Training and Supervision*

Cause IX of the complaint asserts a claim for negligent training and supervision against the City, Lieutenant Arlak, and Chief Hall. In their motion, Defendants advance only one reason why Cause IX should be dismissed: "[I]f Officer Grossman has acted properly, there can be no negligence in training or supervision of him." (Doc. 16 at 17.)[6]

---

[6]    In their reply, Defendants also argue that "Plaintiff makes no argument that . . . Officer Grossman's lawful actions were the product of negligent training and supervision."

This argument lacks merit. Under Arizona law, for an employer to be liable for negligent supervision or training, "a court must first find that the employee committed a tort." *Krieg v. Schwartz*, 2015 WL 12669893, *9 (D. Ariz. 2015) (quoting *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004)).[7] Here, the Court has already concluded the complaint contains plausible allegations that Officer Grossman acted improperly (by arresting C.L. without probable cause, using excessive force, violating the ADA, and committing battery). Thus, the complaint plausibly alleges this element of the negligent training and supervision claim.

Accordingly,

**IT IS ORDERED** that the motion to dismiss (Doc. 16) is **GRANTED IN PART AND DENIED IN PART.** Causes III, IV, VI, and VIII are dismissed and Cause V is dismissed as to Officer Grossman.

Dated this 30th day of January, 2018.

_____
Dominic W. Lanza
United States District Judge

---

(Doc. 22 at 11.) Because Defendants did not advance this argument in their motion, and because it is not based on caselaw that was unavailable at the time Defendants filed their motion, the Court did not consider it. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

[7] Once the underlying tort is established, the employer may be liable "not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment." *Quinonez for & on Behalf of Quinonez v. Andersen*, 696 P.2d 1342, 1346 (Ariz. Ct. App. 1984) (quoting Restatement (Second) of Agency § 213, cmt. d (1952)).