**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Kevin Leibel, et al.,

               Plaintiffs,

v.

City of Buckeye, et al.,

               Defendants.

No. CV-18-01743-PHX-DWL

**ORDER**

## INTRODUCTION

This is a lawsuit brought on behalf of C.L.,[1] an autistic child who was 14 years old at the time of the events in question, against the City of Buckeye (the "City") and three members of the Buckeye Police Department, Officer David Grossman, Lieutenant Charles Arlak, and Chief of Police Larry Hall (collectively, "Defendants"). The claims stem from an incident in July 2017 in which Officer Grossman saw C.L. "stimming"—a self-soothing behavior common in children with autism—with a piece of string while standing alone in a park, mistakenly concluded that C.L. was using an illegal inhalant drug, and approached C.L. to further investigate. During the resulting encounter, portions of which were captured by Officer Grossman's body camera, Officer Grossman asked C.L. what he was doing, C.L. explained that he was stimming, and C.L. then attempted to walk away. In response, Officer Grossman told C.L. to stop, C.L. immediately complied, and Officer Grossman

---

[1]     Because Plaintiffs Kevin and Danielle Leibel bring this action in their capacities as guardians *ad litem* of their son, C.L., the Court will refer to Plaintiffs as "C.L." for ease of reference.

asked him another question.  After answering that question, C.L. again turned to walk away, prompting Officer Grossman to grab C.L.'s arm and attempt to handcuff him.  The pair ultimately went to the ground—the parties dispute whether it was an intentional tackle by Officer Grossman or an accidental fall—and Officer Grossman continued restraining C.L. for several minutes afterward, even after C.L.'s caregiver arrived to explain that he was autistic and had been stimming with the string.  The encounter caused C.L. to sustain various injuries, including an ankle injury that required surgery.

In this action, C.L.'s surviving claims are (1) a pair of § 1983 claims against Officer Grossman for illegal seizure/false arrest and excessive force, (2) a claim under the Americans with Disabilities Act ("ADA") against the City for illegal seizure/wrongful arrest, and (3) state-law claims for battery (Officer Grossman) and negligent training and supervision (the City, Lieutenant Arlak, and Chief Hall).  (Doc. 92.)[2]  At the motion-to-dismiss stage of the case, the Court that concluded Officer Grossman was not entitled to qualified immunity as to the § 1983 claims.  (Doc. 40.)  Officer Grossman pursued an interlocutory appeal of this ruling, but the Ninth Circuit affirmed.  *C.L. by and through Leibel v. Grossman*, 798 F. App'x 1015 (9th Cir. 2020).

Now pending before the Court are Defendants' motion for summary judgment (Doc. 155) and C.L.'s motion for partial summary judgment as to his ADA claim (Doc. 158).  For the following reasons, Defendants' motion is granted in part and denied in part and C.L.'s motion is denied.

## BACKGROUND

I.    Events Leading Up To The Incident

C.L., who was 14 years old at the time of the events in question, has autism and an intellectual disability.  (Doc. 155-2 at 5; Doc. 158-4 at 27.)  On July 19, 2017, Diane Craglow ("Ms. Craglow"), C.L.'s caretaker, took C.L. and his sister, D.L., to D.L.'s piano lesson.  (Doc. 155-2 at 18, 21.)  At some point during the piano lesson, C.L. told Ms.

---

[2]    C.L. asserted several additional claims that were eventually dismissed (Docs. 40, 103) and are no longer relevant.

Craglow that "he didn't want to stay in the lobby" and "wanted to go across the street" to the park.  (*Id.* at 39.)  Ms. Craglow presumed that C.L. wanted to go to the park to stim,[3] because she wouldn't "let [C.L.] stim in the building."  (*Id.* at 39-40.)  Ms. Craglow told C.L. to "[l]ook both ways" and that she would "see him in a few minutes at the park," and C.L. "walked out the door."  (*Id.* at 34, 41.)

Meanwhile, Officer Grossman, "in full uniform," was "passing by, driving by [C.L.] on the street" in a police vehicle.  (Doc. 155-3 at 28-29.)  He observed "what [he] believed to be a young adult male [C.L.] standing on the sidewalk, which would have been on the south side of the park."  (*Id.* at 24-25.)  Officer Grossman's observation of C.L. was that "he was pretty much just standing there, about to start walking" and brought "his hand up close to his face, pretty close to his nose and mouth" in a "cupping motion."  (*Id.* at 24-25, 27.)  Officer Grossman also observed "some object in his right hand that he hit against his left palm and . . . [brought] up to his face," which C.L. appeared to be smelling.  (Doc. 155-5 at 75, capitalization omitted.)   Officer Grossman believed "there was something in [C.L.'s] hand that he was holding."  (Doc. 155-3 at 27.)  Officer Grossman passed C.L. and "started looking in [his] driver side rearview mirror at [C.L.'s] actions," and his observation was that C.L. was "bringing the cupping hand close to his face, and then briefly his body was locking up and almost being affected by whatever was in his hand."  (*Id.* at 27-28.)  Officer Grossman observed C.L. "just turn[] around and walk[] back in the direction he was originally observed in, almost like a pacing back-and-forth type of movement."  (*Id.* at 30-31.)  Officer Grossman turned his vehicle back to face C.L. and "observed him further doing the same movements."  (*Id.*)  Based on Officer Grossman's "previous training in drug recognition, [he] believed possibly [C.L.] was inhaling some type of [illegal] inhalant."  (*Id.*; *id.* at 34-35 ["Q.  If, in fact, that was an inhalant and [C.L.] was using an inhalant in the manner that you described, that would be a crime?  A.  Correct.  Just inhaling

---

[3]      "Stimming," or "self-stimulating behavior," is a very common "self-soothing behavior that a child who has autism will exhibit when he's feeling anxious or nervous or in a new situation.  Or they can just stim because it gives them pleasure."  (Doc. 158-7 at 4; Doc. 158-4 at 29.)

the substance is a crime, not being in possession of one."]; *id.* at 36 ["Q.  There in the park that day, did you suspect that [C.L.] was potentially committing any other crimes other than maybe using an inhalant?  A.  Just the inhalant violation."].)

II.     The Video Of The Incident

The parties have submitted video footage of the incident, which was captured by Officer Grossman's body camera.  (Doc. 161 [Defendants' notice of filing of body camera footage]; Doc. 162 [C.L.'s notice of same].)  The facts below are derived from the Court's review of that video footage.

A.     **Initial Encounter**

Officer Grossman pulled up to the park, parked his vehicle, and exited the vehicle. Officer Grossman began to approach C.L., and the following verbal exchange occurred:

Officer Grossman:  "What's going on?"

C.L.:  "Me?"

Officer Grossman:  "Yeah.  What are you doing?"

C.L.:  "Good."

Officer Grossman:  "What are you doing?"

C.L.:  "I'm stimming."

At this moment, C.L. bent his right arm behind his back, such that his hand was not visible.  His arm straightened and his hand became visible a moment later.

Officer Grossman:  "What?"

C.L.:  "I stim with this."

C.L. presented his left hand, holding the string, to Officer Grossman.  C.L. also began walking backward, away from Officer Grossman.

Officer Grossman:  "What is that?"

Officer Grossman then lifted his right arm and pointed at C.L., stating "Stop walking away from me."

C.L. immediately stopped.

C.L. again presented his left hand, closed in a fist over the string, stating, "It's a

string."

Officer Grossman: "Okay.  So why are you bouncing around all that way?  Do you have any ID on you?"

C.L.: "No."

C.L. then turned to his left and appeared to begin walking away.

Officer Grossman took hold of C.L.'s right arm with both of his hands, stating "Don't go anywhere," and brought C.L.'s arm behind his back.  Officer Grossman then let go with one of his hands to take hold of C.L.'s left arm, bringing both of C.L.'s arms behind his back, telling C.L. to "just relax."

C.L.: "Are you okay?"

C.L. then looked behind him toward Officer Grossman and turned his body as Officer Grossman brought out his handcuffs, such that C.L. and Officer Grossman ended up facing each other.

B.      **On The Ground**

C.L. and Officer Grossman scuffled and both ended up on the ground.  Both on the way down and while on the ground, C.L. was screaming.

It appears there was some kind of struggle as C.L. and Officer Grossman reached the ground.  Officer Grossman instructed C.L. to "stay down," and C.L. yelled, "I'm okay, I'm okay."

Officer Grossman attempted to hold down one of C.L.'s arms, while C.L. shouted "I'm okay!"

Officer Grossman: "Don't move!  You understand?"

C.L.: "No, I'm okay!"

After a moment, C.L. yelled, "Help!"

Officer Grossman:  "Stop moving!"

C.L.: "I'm okay."

Officer Grossman:  "Don't you move, you understand?"

C.L.: "Yeah.  I need help."

1    Officer Grossman:  "Don't move."

2    C.L.:  "I need help."

3    Officer Grossman:  "Stop moving."

4    C.L.:  "Am I going – am I going to go away?"

5    Officer Grossman:  "Relax."

6    C.L.:  "I'll breathe."

7    Officer Grossman:  "You are breathing."

8    C.L.:  "Yeah."

9    C.L. then said something indecipherable.  After a few moments, C.L. again stated,

10    "I'm okay."

11    Officer Grossman:  "Stop moving."

12    C.L.:  "Am I going – am I going – are you going to go away?  Are you going to go

13    away?"

14    Officer Grossman:  "Just relax."

15    C.L.:  "What are you doing?  Hey, what are you doing?"

16    Officer Grossman:  "Just relax, okay?"

17    C.L.:  "Yeah."

18    Officer Grossman:  "Don't move.  You're fine, okay, don't move."

19    C.L. then attempted to say something that the Court couldn't decipher.

20    Officer Grossman:  "What's your name?"  C.L. then told Officer Grossman his

21    name.

22    Officer Grossman:  "Why are you acting like this, [C.L.]?"

23    C.L.:  "Cause I'm okay."

24    **C.**      **Caregiver Arrives**

25    Ms. Craglow is then heard in the background.

26    Officer Grossman:  "Stop moving."

27    At this point, an unspecified electronic device beeped, prompting C.L. to say: "Your

28    time is up."

1    Next, Officer Grossman said to C.L.:  "Relax.  Who's this?"

2    C.L.:  "Diane."

3    Officer Grossman to Ms. Craglow:  "He's fighting with me.  What's going – do you

4  know him?"

5    Ms. Craglow (not visible in video):  "He's got autism."

6    Officer Grossman:  "Okay."

7    Ms. Craglow (still not visible):  "I'm so sorry.  His sister's in a music lesson, he

8  usually just walks around."

9    Officer Grossman:  "Okay.  I'm waiting for another unit to show up, and we're

10  going to figure out what's going on."

11    Ms. Craglow approached the scene and was then visible in the body camera footage.

12    Officer Grossman:  "He's fine, he's breathing, he just started –"

13    Ms. Craglow:  "I'm so sorry."

14    Officer Grossman:  "It's okay."

15    Ms. Craglow:  "I was just in a music lesson, he usually just walks around.  Was he

16  hurting somebody?"

17    Officer Grossman:  "No, I was trying to talk to him.  I wasn't sure what was going

18  on, and then he started trying to back away from me, and then kinda pulled away from me

19  when he seemed like he wanted to run away."

20    Ms. Craglow then sat down, telling C.L., "It's okay, [C.L.], it's okay, babes."

21    C.L.:  "Am I going to be okay?"

22    Ms. Craglow:  "You're okay."

23    Officer Grossman:  "You're okay, alright?"

24    Ms. Craglow:  "I'm sorry he scared you."

25    Officer Grossman:  "Cause – he's doing something with his hands, something with

26  his hands."

27    Ms. Craglow:  "He's stimming."

28    Office Grossman:  "Yeah, I don't know what that is."

1    Ms. Craglow:  "It's when you have autism, it's his nerves."

2    Officer Grossman:  "Okay.  That's fine."

3    Officer Grossman to C.L.:  "Alright, you're gonna relax?"

4    C.L.:  "Yeah."

5    Officer Grossman:  "Okay.  What's her name?"

6    C.L.:  "Diane."

7    Officer Grossman:  "Okay."

8    Ms. Craglow:  "It's okay, babes.  Oh my God, his hand's turning white."

9    Officer Grossman:  "Okay."

10   At this point, Officer Grossman let go of C.L.'s left hand (the hand holding the

11   string) and moved his hand to C.L.'s wrist.

12   Officer Grossman:  "Can you move?"

13   C.L.:  "Yeah."

14   Officer Grossman then tossed his handcuffs onto the grass.  Officer Grossman and

15   Ms. Craglow then told C.L. to not move and stay where he was.

16   Ms. Craglow to Officer Grossman:  "Do you see the string in his hand?"

17   Officer Grossman:  "Yeah –"

18   Ms. Craglow:  "That's what he stims with."

19   At this point in the footage, C.L. was visibly positioned on his side, with Officer

20   Grossman holding his left wrist and his left arm bent, with his left hand laying flat on the

21   grass.  Officer Grossman kept his other hand on C.L.'s shoulder.

22   Officer Grossman:  "But I don't know if it was like some type of drug or something

23   because I couldn't see what he was doing, 'cause as soon as he was doing it –"

24   Ms. Craglow:  "I know.  I'm sorry."

25   Officer Grossman:  "That's okay."

26   Ms. Craglow:  "He comes over here and plays while I'm in the music lesson."

27   C.L.:  "Are we playing?"

28   Officer Grossman:  "Relax.  Okay?  You don't have nothing on you, right?"

1    C.L.: "No."

2    Officer Grossman: "Okay."

3    Ms. Craglow: "He's only fourteen years old."

4    Officer Grossman then whispered something inaudible into his police radio, then

5    stated to C.L.: "Okay, relax, okay?"

6    C.L.: "Okay, I'll take deep breaths."

7    Officer Grossman: "Okay."

8    Ms. Craglow: "Don't move, [C.L.], okay, do me a favor, don't move."

9    A few moments later, Ms. Craglow asked Officer Grossman: "So you drove by and

10   you saw him stimming and you thought he was on drugs?"

11   Officer Grossman: "A couple times, yeah."

12   Ms. Craglow: "You don't know anything about autism, huh?"

13   Officer Grossman: "No."

14   Ms. Craglow: "Sorry."

15   Officer Grossman: "That's okay."

16   C.L.: "Am I in trouble?"

17   D.    **After The Incident**

18   Officer Grossman continued to hold C.L. on the ground until backup arrived.  When

19   the other officer arrived, at one point Officer Grossman told the other officer, "Just want

20   to make sure he doesn't have nothing on him."

21   Officer Grossman then allowed C.L. to sit up and, eventually, stand up.  Once C.L.

22   stood up, Officer Grossman checked C.L. and asked him, "You don't have nothing on

23   you?"  He then permitted C.L. to sit with Ms. Craglow.

24   Later, Officer Grossman explained to Ms. Craglow:  "Yeah, 'cause I drove by a

25   couple of times, and he seemed fine, until he started doing something with his hands."

26   Ms. Craglow then said, "Yeah, he goes like this" and bounced up and down.  "It's

27   called stimming, I'm sorry you're not – if you knew about autism."

28   Officer Grossman:  "It's okay.  And then when I was trying to identify him, it

1    seemed like he wanted to run away from me."

2         Ms. Craglow:  "Well, 'cause you scared him."

3         Officer Grossman's explanation to another officer shortly afterward was as follows:

4    "So he has autism.  So I drove by a few times and then he seemed fine, and then he was

5    doing something with his hand, and like smelling it, and as soon as he was smelling it, it

6    was like he was having like a miniature seizure while he was standing up.  So it was a

7    string that the aunt was telling me about.  So when I – when I went to approach him –"

8         Other Officer:  "It was a string?"

9         Officer Grossman:  "Yeah, it was a string.  I guess he has autism, so the string, I

10   don't know if it calms him down or whatever."

11        Other Officer:  [unintelligible question]

12        Officer Grossman:  "Because he started backing away from me when I was trying

13   to identify him and trying to figure out what's in his hand, and he slightly turned to try and

14   take off and I went to grab him, and I had hands behind his back so I could detain him and

15   figure out what's going on, and as his hands were behind his back, then he started pulling

16   away from me and trying to – so I never let go of him.  And so we twirled around by the

17   tree, and he went down on the ground, and I just held him there."

18        In another account to a different officer, Officer Grossman explained that he initially

19   thought the string "was some type of inhalant or something" and that, once backup arrived,

20   he wanted to make sure C.L. didn't have any weapons or anything else on him.

21   III.   Differing Accounts Of The Incident

22        During their depositions, C.L. and Officer Grossman provided somewhat differing

23   accounts of the incident.  Here, the Court simply sets forth, without comment, each side's

24   account.  In later portions of the order, the Court addresses whether any of these statements

25   may be disregarded for summary judgment purposes due to contradiction with the video or

26   based on credibility considerations.

27        …

28        …

A.    **C.L.'s Account**

C.L. testified that Officer Grossman "tackled" him during the incident.  (Doc. 167-3 at 24, 33, 40.)  C.L. also testified that, during the tackling sequence, Officer Grossman forced him to fall "on the tree."  (*Id.* at 33.)  Finally, C.L. testified that he spun around during the tackling sequence because he was "afraid of [Officer Grossman]."  (*Id.* at 40.)

B.    **Officer Grossman's Account**

1.    Continued Suspicion After Learning That C.L. Was Holding A String

Officer Grossman testified that, even after he learned that the item in C.L.'s hand was a piece of string, he remained suspicious that the string might be a makeshift inhalant or some other form of drug paraphernalia.  (Doc. 155-3 at 62-63 [answering "Absolutely" when asked whether, even after "you saw . . . that it was, in fact, a string . . . did you believe that this string was still a drug paraphernalia or that [C.L] was using it as an inhalant in some way"].)    Officer Grossman elaborated that, based on his past experience, he was aware that "[p]eople have used strings and dip them in inhalants or in hand sanitizer, or rubbing alcohol, and they'll wrap that round their fingers and inhale, then stick the string back in the bottle to refresh."  (*Id.* at 62.)

2.    Concern For A Weapon

Officer Grossman testified that, when C.L. initially bent his arm behind his back, Officer Grossman was "focused on [C.L.'s] hand, because he's reaching behind his back" and was "trying to figure out what he's reaching for."  (Doc. 155-3 at 53.)  Then, once C.L.'s "hand comes from his back," Officer Grossman's focus was on whether C.L. was attempting to "retrieve a weapon."  (*Id.*)

3.    Physical Escalation

Officer Grossman testified that, once he decided to use handcuffs on C.L., and once he had C.L.'s arms behind C.L.'s back, C.L. "started to turn towards the camera, which means he's turning towards [Officer Grossman]" "and started to raise his hands up."  (*Id.* at 70, 74.)  Officer Grossman attempted "to grab his hands, wrists, or arms, when it was about chest high."  (*Id.* at 74.)  Notably, Officer Grossman denied that he intentionally

- 11 -

tackled C.L.—instead, he testified they "fell" because they "lost [their] footing." (*Id.* at 74, 118.)  Officer Grossman also denied that C.L. hit the tree on the way down.  (*Id.*)  The tree did, however, "help[] to contain [C.L.] where he was laying" because "[w]hile [Officer Grossman] was trying to keep his hands down, as to control him," C.L. "kept turning his body like to the right, trying to face [Officer Grossman]" and "kept rubbing his body up against the tree," so "if the tree wasn't there, then he would [have been] successful in rolling over on his back and possibly having more avenue of escape."  (*Id.* at 76-77.)  Officer Grossman further testified that, "when [C.L.] was on the ground . . . [Officer Grossman] was trying to keep his hands from being released," and C.L. was "giving force and resistance."  (*Id.* at 79.  *See also id.* at 118 ["He was still resisting, trying to push off of me, basically trying to get out of my grasp, was trying to get up, was still struggling with me."].)

### 4.   Holding C.L. Until Backup Arrived

Officer Grossman testified that he continued to hold C.L. on the ground, even after learning that C.L. was autistic, because, although "him being autistic [did] play a factor," it was "safer for [Officer Grossman] to wait for another unit to make sure he [didn't] have any weapons on him," especially "because of how violent [C.L. was] trying [to] resist, trying to push."  (*Id.* at 82.)

## DISCUSSION

### I.   Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the

1    undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

2        A party moving for summary judgment "bears the initial responsibility of informing

3    the district court of the basis for its motion, and identifying those portions of 'the pleadings,

4    depositions, answers to interrogatories, and admissions on file, together with the affidavits,

5    if any,' which it believes demonstrate the absence of a genuine issue of material fact."

6    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of

7    production, the moving party must either produce evidence negating an essential element

8    of the nonmoving party's claim or defense or show that the nonmoving party does not have

9    enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

10   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . .

11   [the] moving party carries its burden of production, the nonmoving party must produce

12   evidence to support its claim or defense."  *Id.* at 1103.

13       "If the nonmoving party fails to produce enough evidence to create a genuine issue

14   of material fact, the moving party wins the motion for summary judgment."  *Id.*  There is

15   no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty

16   Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not

17   significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citations

18   omitted).  At the same time, the evidence of the non-movant is "to be believed, and all

19   justifiable inferences are to be drawn in his favor." *Id.* at 255.  "[I]n ruling on a motion for

20   summary judgment, the judge must view the evidence presented through the prism of the

21   substantive evidentiary burden."  *Id.* at 254.  Thus, "the trial judge's summary judgment

22   inquiry as to whether a genuine issue exists will be whether the evidence presented is such

23   that a jury applying that evidentiary standard could reasonably find for either the plaintiff

24   or the defendant."  *Id.* at 255.

25       "[W]hen parties submit cross-motions for summary judgment, [e]ach motion must

26   be considered on its own merits," but the Court must consider all evidence submitted in

27   support of both cross-motions when separately reviewing the merits of each motion.  *Fair

28   Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.

2001) (internal quotation marks omitted).  For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).  The party without the burden of persuasion at trial—usually the defendant—is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts.  *Celotex*, 477 U.S. at 322-23.  This distinction reflects that the burden is ultimately on the proponent of each claim to prove it.  *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

II.   <u>Cross-Motions For Summary Judgment</u>

Defendants seek summary judgment on all five of C.L.'s remaining claims. Specifically, Defendants contend that: (1) Officer Grossman is entitled to qualified immunity on the § 1983 claim for illegal seizure/false arrest; (2) Officer Grossman is entitled to qualified immunity on the § 1983 claim for excessive force; (3) there is insufficient evidence to support the ADA claim against the City; (4) the state-law battery claim against Officer Grossman fails because he has a valid justification defense under A.R.S. § 13-409; and (5) the state-law negligent training and supervision claim fails for various reasons.  (Doc. 155 at 10-30.)  C.L. disagrees, arguing that all of his claims should survive summary judgment (and that he is entitled to partial summary judgment on his ADA claim), and offers an affirmative reason why both of his § 1983 claims against Officer Grossman must survive—due to application of the law-of-the-case doctrine and "mandate rule" stemming from the Ninth Circuit's earlier decision in this case.  Because that

- 14 -

argument could potentially address two claims, the Court begins there.

A.   **Law Of The Case/Mandate Rule**

"The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *In re Rainbow Mag., Inc.*, 77 F.3d 278, 281 (9th Cir. 1996) (internal quotation marks omitted). "Law of the case rules are founded upon the sound public policy that litigation must come to an end" and "serve[] to maintain consistency." *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc). The "law of the case is a discretionary doctrine" and is "not a limit to [a court's] power." *Id.* (internal quotation marks omitted). A "court may have discretion to depart from the law of the case" if (1) "the first decision was clearly erroneous," (2) "an intervening change in the law has occurred," (3) "the evidence on remand is substantially different," (4) "other changed circumstances exist," or (5) "a manifest injustice would otherwise result." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). On remand, a district court is "required to follow [the Ninth Circuit's] decisions, but only as to issues actually addressed and explicitly or implicitly decided upon in the court's previous disposition." *United States v. Garcia-Beltran*, 443 F.3d 1126, 1129 (9th Cir. 2006).

As noted, the Ninth Circuit affirmed the denial of qualified immunity at the motion-to-dismiss stage based on the facts alleged in C.L.'s complaint. *C.L.*, 798 F. App'x 1015. C.L. argues that, because the Ninth Circuit held that qualified immunity was improper then, "the prior ruling informs all future analyses" and, because the evidence now in the record confirms the facts alleged in the complaint, "qualified immunity has already been decided . . . and the Court should not disturb these earlier rulings." (Doc. 167 at 10-13.) Defendants respond that the standard for surviving a motion to dismiss under Rule 12(b)(6) is different than the standard for surviving a motion for summary judgment under Rule 56 and that "whether [C.L.] pled adequately enough information to survive a [Rule 12(b)(6)] motion is irrelevant and insufficient to establish the burden a moving party bears in a [Rule 56]

motion."  (Doc. 173 at 3-5.)

Defendants are correct that, in general, motions to dismiss under Rule 12(b)(6) and motions for summary judgment under Rule 56 are analyzed under different standards. Thus, the Ninth Circuit's opinion does not automatically constitute law of the case at this stage.  *See, e.g.*, *Peck v. Hinchey*, 2017 WL 2929464, *5 n.5 (D. Ariz. 2017) ("Plaintiffs misapply the 'law of the case' doctrine by arguing that this Court's analysis under the motion to dismiss standard must result in the same outcome at the summary judgment stage.  The denial of motions to dismiss do not constitute law of the case for the purpose of summary judgment.") (citation and internal quotation marks omitted); *Braden Partners, LP v. Twin City Fire Ins. Co.*, 2017 WL 63019, *6 (N.D. Cal. 2017) ("Given the different standards for motions to dismiss and motions for summary judgment, courts may (and routinely do) reconsider the same legal arguments at the summary judgment stage."); *Guadiana v. State Farm Fire & Cas. Co.*, 2009 WL 3763693, *6 (D. Ariz. 2009) ("[T]he law of the case ordinarily does not apply to issues raised on summary judgment after they were rejected on a motion to dismiss because motions for summary judgment are subject to a different standard.").

On the other hand, Defendants misconstrue the exact nature of C.L.'s argument. C.L. is not arguing that the Ninth Circuit held once and for all that qualified immunity was improper in this case.  Instead, C.L. argues that the evidence now in the record confirms the particular factual allegations that the Ninth Circuit identified as being sufficient, when presumed true, to deny qualified immunity.  In other words, C.L. argues that the facts presumed true at the motion-to-dismiss stage have now been proved true, so the Ninth Circuit's earlier holding compels the same result now.

C.L. is correct that the law-of-the-case doctrine may be applied in this manner.  *See, e.g.*, *Bollinger v. Oregon*, 172 F. App'x 770, 771 (9th Cir. 2020) ("Since, in the posture presented to us, this qualified immunity question is a purely legal one, and *Bollinger I* held that the defendants were not entitled to qualified immunity, that holding controls this appeal as law of the case.  Although on remand, defendants produced evidence in support

of their motion for summary judgment, no evidence relevant to qualified immunity was presented, so that the law of the case is still applicable."); *Guadiana*, 2009 WL 3763693, at *6 ("Here, . . . State Farm[] asks the court, on 'summary judgment', to make a ruling on the construction of the homeowner's policy as a matter of law without resorting to any additional evidence.  This is essentially a second motion to dismiss raising the same issues the court has already considered and rejected.  The law of the case doctrine applies in this instance.").  The critical question, then, is whether Defendants have introduced new material evidence that was not before the Ninth Circuit.  *See, e.g.*, *Pubali Bank v. City Nat'l Bank*, 777 F.2d 1340, 1342 (9th Cir. 1985) ("When . . . the plaintiff moves on remand for summary judgment, the trial judge may decide the motion in accordance with the law of the case, based on the appellate conclusions, *if no evidence that affects the appellate ruling* is offered in opposition to the summary judgment.  The trial court cannot grant the motion solely in reliance on the appellate holdings; it must examine whatever the materials . . . present[ed] in opposition to the summary judgment.  If that material produces no new evidence and evinces no factual dispute, the resolution of which might change the law applied by the appellate court, the trial court should enter judgment for the plaintiff as a matter of law.") (emphasis added) (citation omitted).  Accordingly, it is necessary to examine the Ninth Circuit's holding to determine (1) which factual allegations it viewed as material to its holding and (2) whether additional evidence has been introduced by Defendants on remand that calls those factual allegations into question and/or potentially triggers an entitlement to qualified immunity on grounds not previously considered.

1.   Illegal Seizure/False Arrest

a.   **The Ninth Circuit's Holding**

The Ninth Circuit held that "C.L.'s allegations support[ed] his claim under Count 1 that he was stopped without reasonable suspicion and detained without probable cause." *C.L.*, 798 F. App'x at 1015-16.  Concerning reasonable suspicion, the facts deemed salient by the Ninth Circuit were that, "[a]ccording to the allegations of the complaint": (1) Officer Grossman "suspected C.L. of using an illegal inhalant when, driving by a public park, he

saw C.L. sitting by himself and making repetitive movements with his hands"; and (2) "C.L. responded to Grossman's questions and showed that he was holding only a piece of string." *Id.* at 1016.  The Ninth Circuit held that, at the point C.L. showed that he was only holding a piece of string, "Grossman's investigation had run its course and there was no basis to support continuation of the stop."  *Id.*  Concerning whether the investigatory stop was converted into an arrest, the salient facts as alleged were that "when C.L. 'turned to leave,' Grossman prevented him from doing so and 'pinned' him down until backup arrived."  *Id.*  The Ninth Circuit held that, "[u]nder those circumstances, a reasonable person would not have felt free to leave," so an arrest occurred.  *Id.*  Finally, the Ninth Circuit held that the arrest was unlawful and violated clearly established law because the "complaint did not allege facts that would make it 'reasonably arguable' that probable cause existed"—"[a]fter seeing that C.L. was holding only a string and certainly after learning from C.L.'s caregiver that he was autistic, no officer of reasonable caution would have had any reason to believe that C.L. was using an illegal inhalant or otherwise engaging in criminal activity."  *Id.* (internal quotation marks omitted).

b.  **Analysis**

The Ninth Circuit's analysis of C.L.'s illegal seizure/false arrest claim is not entitled to preclusive effect under the law-of-the-case doctrine because Defendants have introduced additional evidence that calls into question some of the factual assumptions underlying the Ninth Circuit's analysis and may serve as a pathway to qualified immunity on grounds not considered by the Ninth Circuit.

To be sure, the evidence now in the record supports many of the factual allegations that the Ninth Circuit found material in arriving at its holding.  Specifically, it is undisputed that (1) "Grossman suspected C.L. of using an illegal inhalant" when he was driving by a public park and observed C.L.'s behavior; (2) "C.L. responded to Grossman's questions and showed that he was holding only a piece of string"; (3) "when C.L. 'turned to leave,' Grossman prevented him from doing so" and held him on the ground until backup arrived (although the parties dispute how to characterize this event); and (4) Grossman saw that

"C.L. was holding only a string" and learned "from C.L.'s caregiver that he was autistic," yet continued detaining him after obtaining that information. *Id.* However, this is not the only evidence in the record. Most important, Defendants have now introduced evidence that Officer Grossman had experience with individuals soaking strings (or the like) in illegal inhalants. This is a potentially important new piece of evidence because the Ninth Circuit's analysis was based, in part, on its acceptance of C.L.'s allegation that, "at th[e] point" Officer Grossman learned C.L. was only holding a piece of string, "Grossman's investigation had run its course and there was no basis to support continuation of the stop." *C.L.*, 798 F. App'x at 1016. *See also id.* ("*The complaint did not allege facts that* would make it 'reasonably arguable' that probable cause existed . . . [a]fter seeing that C.L. was holding only a string and . . . after learning from C.L.'s caregiver that he was autistic . . . .") (emphasis added). But now, that allegation is controverted—Officer Grossman testified that merely seeing the string did not eliminate the possibility that C.L. was using an illegal inhalant (and, thus, the investigation hadn't run its course).

In a similar vein, Defendants have now introduced evidence that Officer Grossman saw C.L. make a gesture toward his back, which Officer Grossman thought could be a move to grab a weapon. The complaint did not mention the possibility of a weapon and the Ninth Circuit did not factor this possibility into its analysis.

Finally, Defendants have also introduced evidence that Officer Grossman initially used physical force against C.L. because C.L. attempted to flee; that the physical escalation that ended with C.L. and Grossman on the ground was caused in part by C.L.'s conduct of pulling away and turning toward Officer Grossman with his hands up "almost in a fighting technique"; and that Officer Grossman continued to restrict C.L.'s movement while on the ground because Officer Grossman thought C.L. was resisting the detainment. (Doc. 155 at 4-10.) None of this evidence was before the Ninth Circuit and some of it has the potential to contradict the factual allegations in the complaint that the Ninth Circuit accepted for purposes of its analysis.

…

1

2.      Excessive Force

2

a.      **The Ninth Circuit's Holding**

3      When rejecting Officer Grossman's claim of qualified immunity as to C.L.'s

4   excessive force claim, the Ninth Circuit noted that the "Fourth Amendment requires police

5   officers to use an objectively reasonable degree of force when executing an arrest or

6   detention." *C.L.*, 798 F. App'x at 1016 (internal quotation marks omitted).  When assessing

7   reasonableness, the court considered the severity of the crime, "whether the suspect pose[d]

8   an immediate threat to the safety of the officers or others, and whether he [was] actively

9   resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks

10  omitted).  The court held that "the allegations of the complaint indicate[d] that C.L. was

11  suspected of committing a relatively minor crime, did not pose a threat to anyone's

12  safety, . . . was not actively resisting or attempting to flee from arrest," and "C.L. did [not]

13  continue or escalate resistance." *Id.* at 1016-17.  Accordingly, "taking and holding C.L. to

14  the ground was unreasonable under the circumstances." *Id.* at 1017.  The court further

15  emphasized that, "[e]specially after C.L.'s caregiver arrived on the scene and explained

16  that C.L. was autistic, this was an 'obvious case' in which an reasonable officer would have

17  understood that continued use of force would violate the Fourth Amendment." *Id.*

18

b.      **Analysis**

19      Although the evidence now in the record supports many of the factual allegations

20  on which the Ninth Circuit relied when denying qualified immunity as to the excessive

21  force claim, Defendants have proffered additional evidence that renders the law-of-the-

22  case doctrine inapplicable.  Specifically, although it is undisputed that Officer Grossman

23  only suspected C.L. of ingesting an illegal inhalant (which, the Court previously noted, is

24  not the crime of the century), Defendants have now proffered evidence intended to

25  establish that Officer Grossman thought C.L. was attempting to flee and resisted

26  detainment, escalating the encounter.  This new evidence has the potential to contradict the

27  Ninth Circuit's assumptions that C.L. "was not actively resisting or attempting to flee from

28  arrest" and "did [not] continue or escalate resistance." *C.L.*, F. App'x at 1016-17.

1    Applying the law-of-the-case doctrine on this record would be inappropriate.

2        Accordingly, the Court turns to the merits of Officer Grossman's entitlement to

3    qualified immunity as to C.L.'s § 1983 claims.

4        **B.    Count One: Illegal Seizure/False Arrest**

5            1.    Qualified Immunity Standard

6        "When an officer asserts qualified immunity as a defense, . . . [courts] first ask

7    whether the facts taken in the light most favorable to the plaintiff show that the officer's

8    conduct violated a constitutional right.  If so, [courts] then ask whether the right in question

9    was clearly established at the time of the officer's actions, such that any reasonably well-

10   trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*,

11   949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted).  "Although [courts] must view the

12   facts in the light most favorable to the nonmoving party, when considering qualified

13   immunity, [courts] are also limited to considering what facts the officer could have known

14   at the time of the incident." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

15       For purposes of the second step's "clearly established" inquiry, although there need

16   not be a "case directly on point," "existing precedent must have placed the statutory or

17   constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  In

18   other words, the case law must "have been earlier developed in such a concrete and

19   factually defined context to make it obvious to all reasonable government actors, in the

20   defendant's place, that what he is doing violates federal law." *Shafer v. County of Santa

21   Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).  *See also Kisela v. Hughes*, 138 S. Ct. 1148,

22   1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—

23   not to define clearly established law at a high level of generality.") (internal quotation

24   marks omitted).  Additionally, "[o]nce the defense of qualified immunity is raised by the

25   defendant, the plaintiff bears the burden of showing that the rights allegedly violated were

26   'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).  *See also

27   Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the

28   burden of proof that the right allegedly violated was clearly established at the time of the

1    alleged misconduct.").[4]

2                    2.    Constitutional Violation

3           Although it "is often beneficial" to begin the qualified-immunity analysis by

4    addressing whether a statutory or constitutional right has been violated, district courts are

5    vested with discretion to determine "which of the two prongs of the qualified immunity

6    analysis should be addressed first in light of the circumstances in the particular case at

7    hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  *See also Orn*, 949 F.3d at 1174

8    ("We have the discretion to skip the first step in certain circumstances, as when the officer

9    is plainly entitled to prevail at the second step."); *Sjurset v. Button*, 810 F.3d 609, 615 (9th

10   Cir. 2015) ("If indeed the [Defendants] did not violate clearly established law, then we can

11   determine that qualified immunity is appropriate and may thus dispose of the case without

12   undertaking an analysis of whether a constitutional violation occurred in the first

13   instance.").  Here, the Court chooses to begin by analyzing whether a reasonable jury could

14   find that Officer Grossman violated C.L.'s Fourth Amendment right to be free from

15   unreasonable seizures.  "If no violation is found, [a plaintiff] cannot prevail.  On the other

16   hand, if there is a violation (or if there is a triable question of fact in that regard), then [the

17   Court] must determine whether that constitutional violation was clearly established at the

18   time."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007).  The Court must

19   construe the facts in the light most favorable to C.L. and resolve factual disputes in his

20   favor unless his version of events is so "blatantly contradicted by the record, so that no

21   reasonable jury could believe it."   *Orn*, 949 F.3d at 1171 (internal quotation marks

22   omitted).  The Court may not "credit [Officer Grossman's] version of the facts" or "assume

23

24   _____

     [4]      Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit
25   opinions hold that "[q]ualified immunity is an affirmative defense that the government has
     the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017).
26   These opinions are difficult to reconcile.  *See generally Slater v. Deasey*, 943 F.3d 898,
     909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel
27   committed . . . error in suggesting that Defendants bear the burden of proof on the
     disputed qualified-immunity issues presented in this appeal. . . .  [T]he applicable—and
     well-settled—rule [in the Ninth Circuit] is that the plaintiff bears the burden of proof that
28   the right allegedly violated was clearly established at the time of the alleged misconduct.")
     (cleaned up).

that a jury would resolve factual disputes in *his* favor." *Id.* However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). *See also Hernandez v. City of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021) ("[W]e do not accept a non-movant's version of events when it is 'clearly contradict[ed]' by a video in the record.") (alteration in original) (citation omitted).

On the merits, Defendants argue that no constitutional violation occurred for the following reasons: (1) Officer Grossman's interaction with C.L. before he applied force was a consensual encounter that did not implicate the Fourth Amendment; (2) to the extent Officer Grossman's initial encounter with C.L. was an investigatory stop under *Terry*, he had reasonable suspicion to conduct it because "this case bears all the hallmarks supporting reasonable suspicion—behavior consistent with illegal activity; reaching toward an area where a weapon could be kept, odd demeanor and inability to provide cogent responses, presence in a high-crime area, and attempted flight"; (3) Officer Grossman's scuffle with C.L. did not convert the investigatory stop into an arrest, because the total physical detention was only five minutes long and C.L.'s own actions in attempting to leave and resisting lengthened the detention and escalated it to the level of requiring physical force; and (4) alternatively, even if "the detention converted to an arrest," there was arguable probable cause to perform an arrest because C.L.'s conduct of "wheeling around, causing himself and Officer Grossman to fall to the ground, and then continuing to resist" constituted a violation of A.R.S. § 13-2508; and (5) further alternatively, had Officer Grossman recognized C.L.'s autism, he would have been justified in detaining C.L. pursuant to Arizona's "community caretaker" statute, A.R.S. § 36-525. (Doc. 155 at 10-17, emphasis omitted.)

### a.   **Consensual Encounter**

Defendants argue that Officer Grossman's initial encounter with C.L., during which Officer Grossman asked C.L. what he was doing and whether he had any identification,

1    was a consensual encounter outside of the strictures of the Fourth Amendment.  (Doc. 155

2    at 12.)  C.L. responds that the encounter was not consensual because Officer "Grossman

3    stuck out his right hand and instructed C.L., 'stop walking away from me,' unequivocally

4    restricting C.L.'s movement with a show of official authority, and effectuating a seizure

5    under the Fourth Amendment."  (Doc. 167 at 15.)

6        "[A]n initially consensual encounter between a police officer and a citizen can be

7    transformed into a seizure or detention within the meaning of the Fourth Amendment, if,

8    in view of all the circumstances surrounding the incident, a reasonable person would have

9    believed that he was not free to leave."  *INS v. Delgado*, 466 U.S. 210, 215 (1984) (internal

10   quotation marks omitted).  "[T]o determine whether a particular encounter constitutes a

11   seizure, a court must consider all the circumstances surrounding the encounter to determine

12   whether the police conduct would have communicated to a reasonable person that the

13   person was not free to decline the officers' requests or otherwise terminate the encounter."

14   *Florida v. Bostick*, 501 U.S. 429, 439 (1991).  "[N]o seizure occurs when police ask

15   questions of an individual[] [or] ask to examine the individual's identification," "so long

16   as the officers do not convey a message that compliance with their requests is required."

17   *Id.* at 437.  The Ninth Circuit has "identified several factors to consider in determining if a

18   person was seized, any one of which, if present, could constitute a seizure: (1) the number

19   of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a

20   public or non-public setting; (4) whether the officer's tone or manner was authoritative, so

21   as to imply that compliance would be compelled; and (5) whether the officers informed the

22   person of his right to terminate the encounter."  *United States v. Washington*, 490 F.3d 765,

23   771-72 (9th Cir. 2007).

24       Although Defendants are correct that Officer Grossman could approach C.L. and

25   ask him questions, including requesting identification from him, without implicating the

26   Fourth Amendment,[5] a reasonable juror could find that Officer Grossman's "tone or

---

27   [5]     Although C.L. argues that he was detained because that was Officer Grossman's
28   intention from the beginning, "[t]he proper focus when determining coerciveness or
     restraint sufficient to constitute an arrest or detention is not on the subjective belief of the
     [police officers].  Rather, [courts] review the situation from the perspective of the person

manner was authoritative, so as to imply that [C.L.'s] compliance would be compelled." *Id.* at 771.  Officer Grossman told C.L. to "[s]top walking away from me," a command with which C.L. immediately complied.  A reasonable person (let alone a reasonable 14-year-old autistic boy), when confronted with a police officer's command to "stop walking away," wouldn't have felt free to ignore the officer's request and go about his business. *Cf. Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It must be recognized what whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."); *United States v. Brown*, 996 F.3d 998, 1006 (9th Cir. 2021) ("[O]nce Wining ordered Brown to stand up and turn around . . . Wining affirmatively asserted authority over Brown's movements and at that point Brown was seized for Fourth Amendment purposes.") (cleaned up); *United States v. Smith*, 594 F.3d 530, 539 (6th Cir. 2010) ("Once Officer Putnick asked Smith to stop, a reasonable person would not have felt free to leave and the interaction turned into a *Terry* stop.").  And, indeed, C.L. did not go about his business but instead stopped immediately.  Perhaps the most telling evidence that C.L. was not free to leave was that, when he turned away for a second time after he responded to Officer Grossman's question about identification, Officer Grossman physically prevented him from leaving.  A reasonable juror could conclude that C.L. was thus seized, implicating the Fourth Amendment.

<b>b.    Reasonable Suspicion</b>

Defendants argue that Officer Grossman was entitled to conduct a *Terry* stop and detain C.L. because Officer Grossman had reasonable suspicion that C.L. was ingesting an illegal inhalant.  (Doc. 155 at 12-14.)  Defendants further argue that "C.L.'s conduct in backing away from Grossman, and then attempting to flee the scene also support reasonable suspicion."  (*Id.*)  C.L. appears to respond along the lines of what the Ninth Circuit held on appeal—that reasonable suspicion dissipated once C.L. showed Officer Grossman he was only holding a piece of string or, at the latest, once Ms. Craglow arrived on the scene and informed Officer Grossman that C.L. is autistic and uses the string to stim

seized."  *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988).

and calm his nerves.  (Doc. 167 at 13.)  Defendants reply that "[d]isplaying a string does not change the analysis" because "the use of inhalants can involve dipping solvents in strings, and then wrapping the string around a finger to inhale the intoxicant."  (Doc. 173 at 9.)  C.L. disputes Officer Grossman's justification about strings dipped in solvent because, "[d]uring Officer Grossman's recorded bodycam explanations to other officers, he never mentioned suspecting that the string was soaked in an illegal inhalant," which C.L. views as placing Officer Grossman's credibility in dispute.  (Doc. 167 at 17.)

"[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause."  *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).  "In evaluating the validity of a [*Terry*] stop . . . , [courts] must consider the totality of the circumstances—the whole picture."  *Sokolow*, 490 U.S. at 8 (internal quotation marks omitted).

C.L. does not appear to dispute that Officer Grossman had reasonable suspicion to initially stop him and ask questions, and the Court agrees.  In *Ramirez v. City of Buena Park*, 560 F.3d 1012 (9th Cir. 2009), a police officer approached the plaintiff, who was reclining in his parked car "outside a drugstore with his parking lights on" a "few minutes before 8:00 p.m."  *Id.* at 1021.  "Ramirez had his eyes closed and appeared to be sleeping at the wheel; Ramirez appeared to be breathing rapidly; and Ramirez gave a 'testy' response when [the police officer] tapped on his window."  *Id.*  The police officer, who had "eighty hours of training in drug influence recognition," suspected that Ramirez was under the influence of illegal stimulants and ordered Ramirez out of the car.  *Id.* at 1020-21.  The Ninth Circuit held that the police officer's actions did not violate the Fourth Amendment because the officer had reasonable suspicion.  *Id.* at 1021.  The court noted that, "[a]lthough each fact, standing alone, [was] completely legal, [c]onduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer" and

that, to a police officer with extensive drug influence recognition training, "these facts taken together amounted to reasonable suspicion that Ramirez was under the influence of illegal stimulants." *Id.* (third alteration in original) (internal quotation marks omitted). So, too, here. Officer Grossman testified that C.L. was making odd movements that, based on Officer Grossman's drug recognition training, suggested C.L. was ingesting an illegal inhalant. Officer Grossman testified that C.L. would cup his hand, appeared to be holding something, and would bring his hand to his face, after which C.L. appeared to seize up. The Court agrees that, although C.L.'s behavior was ultimately entirely innocent, C.L.'s movements, coupled with Officer Grossman's drug recognition training, rose to the level of supporting reasonable suspicion to initially detain C.L.

The analysis becomes more complicated after C.L. explained that he was stimming and showed Officer Grossman that all he had in his hand was a piece of string. As noted, the Ninth Circuit construed the allegations in the complaint as establishing that, once C.L. showed the string to Officer Grossman, any reasonable suspicion dissipated. *C.L.*, 798 F. App'x at 1016. However, because this case has now reached the summary judgment stage, the analysis is guided by the evidence, not the allegations in the complaint. This distinction is critical because the undisputed evidence establishes that Officer Grossman retained reasonable suspicion—and, thus, retained the authority to perform and complete a *Terry* stop—even after C.L. showed him the piece of string. As noted, Officer Grossman specifically testified that he believed "this string was still . . . drug paraphernalia or that [C.L.] was using it as an inhalant in some way" and explained that this belief was based on his past experience of "[p]eople . . . us[ing] strings and dip[ping] them in inhalants or hand sanitizer, or rubbing alcohol." (Doc. 155-3 at 62.)

Plaintiffs' only response to this evidence (other than to argue, incorrectly, that it is foreclosed by the law-of-the-case doctrine) is to suggest that it is unworthy of credence for summary judgment purposes because Officer Grossman's credibility is at issue. This argument is unavailing. "[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment." *Nat'l*

*Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983). Also, although C.L. argues that Officer Grossman's deposition testimony was inconsistent with his explanation of the incident on the bodycam footage and in his police report, Officer Grossman's account ultimately doesn't contradict his prior explanations of the event—at no point did Officer Grossman state that seeing the string dispelled his suspicion that criminal activity was afoot. Under these circumstances, C.L.'s mere assertion that Officer Grossman is making up this justification, without offering any evidence to the contrary, is insufficient to create a genuine issue of fact. *Cf. Ramirez*, 560 F.3d at 1021 ("Although Ramirez claims he was not breathing fast, this mere assertion cannot create a disputed issue. He offers no evidence to the contrary, but instead attempts to point to a contradiction in Montez's declaration and police report. Montez, however, did not contradict himself; his declaration says Ramirez was breathing quickly while sleeping, and his police report confirms the quick breathing, without specifying when it began. Furthermore, nobody disputes that Ramirez's breathing was 'abnormal[ly]' fast after he woke up. As a result, we must accept Montez's assertion that Ramirez was breathing quickly while asleep.") (alteration in original). The Court thus agrees with Defendants that Officer Grossman maintained reasonable suspicion, and was justified in continuing the investigative detention, even after C.L. showed he was only holding a string. Therefore, C.L. cannot prevail on Count One to the extent it is premised on the theory that Officer Grossman conducted a *Terry* stop without reasonable suspicion—he must show an arrest occurred.

### c.    **Whether An Arrest Occurred**

The next issue is whether Officer Grossman converted the detention into an arrest, requiring probable cause, by taking hold of C.L.'s arm and attempting to handcuff him when he turned to leave, by tackling him, and/or by continuing to lay on him after they went to the ground.

Defendants argue the encounter remained a *Terry* stop that was "extended only when C.L. attempted to flee the investigation, and then resisted Grossman's efforts to control him after the two fell to the ground." (Doc. 155 at 14-16.) Defendants also argue

1   that Officer Grossman's use of physical force is not sufficient to convert the detention into

2   an arrest because use of physical force is permissible to protect officer safety, to maintain

3   the status quo, or where the suspect is uncooperative or indicates a reasonable possibility

4   of flight.  (*Id.*)  Defendants argue these considerations are present here because "C.L.

5   [made] a distinct pivot to leave the scene before Officer Grossman [used] any physical

6   force, and then wheel[ed] around back toward Officer Grossman before the two of them

7   fell to the ground."  (*Id.*)  C.L. does not specifically argue otherwise in his response (Doc.

8   167), which Defendants construe as a concession (Doc. 175 at 11).  Although C.L. did not

9   directly respond to this argument, the Court will address it because C.L. relies heavily

10  throughout his response on the Ninth Circuit's decision at the motion-to-dismiss stage, in

11  which the court held that the detention *was* converted into an arrest.  *C.L.*, 798 F. App'x at

12  1016 ("Whether an arrest took place depends on the totality of the circumstances,

13  considering, among other things, 'whether a reasonable innocent person in these

14  circumstances would . . . have felt free to leave after brief questioning.  It is alleged that

15  when C.L. 'turned to leave,' Grossman prevented him from doing so and 'pinned' him

16  down until backup arrived.  Under those circumstances, a reasonable person would not

17  have felt free to leave.") (alteration in original) (citation omitted).

18      "There is no bright-line rule to determine when an investigatory stop becomes an

19  arrest.  Rather, in determining whether stops have turned into arrests, courts consider the

20  totality of the circumstances.  As might be expected, the ultimate decision in such cases is

21  fact-specific."  *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citations and

22  internal quotation marks omitted).  Applying these standards, and with the benefit of oral

23  argument,[6] the Court concludes that no reasonable jury could find that Officer Grossman

24  ────────────────────

25  [6]      In the tentative ruling issued before oral argument, the Court concluded a reasonable
    jury could find that Officer Grossman converted the *Terry* stop into an arrest.  (Doc. 182
26  at 30-34.)  Upon reflection, this conclusion was mistaken.  Although the tentative ruling
    stated that a reasonable jury could find that C.L.'s second attempt to walk away from
27  Officer Grossman did not constitute a "flight" attempt (and, thus, did not justify Officer
    Grossman's resulting use of force to prevent C.L. from leaving), Defendants' counsel
28  correctly pointed out during oral argument that an officer performing a *Terry* stop is
    entitled to use force to keep the suspect from leaving before the stop is complete.  The
    cases establishing this principle, which did not appear in the tentative ruling, have been

converted the *Terry* stop into an arrest.

The undisputed chronology, as established by the video from Officer Grossman's body camera, is that (1) Officer Grossman approached C.L. to ask what C.L. was doing and to inquire about the item in C.L.'s hand; (2) C.L. began walking away, Officer Grossman told him to stop, and C.L. stopped; (3) C.L. answered the question about the item in his hand ("It's a string"), as well as another question about whether he had identification, and then turned to walk away for a second time; and (4) in response to C.L.'s second attempt to walk away, Officer Grossman grabbed C.L.'s arm, said "Don't go anywhere," and then began attempting to handcuff C.L., with the pair eventually going to the ground.

C.L.'s second attempt to walk away from Officer Grossman[7] is the key event for purposes of assessing whether the *Terry* stop was converted to an arrest.  An officer conducting a *Terry* stop is "authorized to take such steps as [are] reasonably necessary . . . to maintain the status quo during the course of the stop."  *United States v. Hensley*, 469 U.S. 221, 235 (1985).  This necessarily means that an officer conducting a *Terry* stop may use force to prevent the suspect from leaving before the stop has run its course.  *See, e.g., Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) ("The whole point of an investigatory stop, as the name suggests, is to allow police to *investigate* . . . ."); *United States v. Haye*, 825 F.2d 32, 35 (4th Cir. 1987) ("By its very nature, . . . a *Terry* stop is involuntary, and the suspect is not free to avoid it by flight.  To that extent, his freedom is limited, and the policeman is authorized to use such reasonable force as may be necessary to accomplish the purpose of the limited stop.").  The use of such force doesn't convert the *Terry* stop into an arrest, even if the suspect doesn't feel free to leave.  *See, e.g.*, *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) ("While Edwards emphasizes the fact that he was not 'free to leave' the scene, this does not mark the point where a *Terry* stop

---

added to this order.

[7]     It is undisputed that C.L. made this attempt—it is clearly depicted in the video and C.L. acknowledges in the complaint that he "turned to leave" after answering Officer Grossman's question about identification (Doc. 92 ¶ 75).

escalates into an arrest, since in neither a stop nor an arrest is a suspect free to leave.”). Were this not the rule, suspects could easily thwart *Terry* stops through non-cooperation and flight.  *See, e.g.*, *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981) (“A valid stop is not transformed into an arrest merely because law enforcement agents momentarily restrict a person’s freedom of movement. . . .  A contrary result would leave agents powerless to perform their investigative functions without the cooperation of suspects.”); *Jarvis v. Conway*, 2019 WL 2171562, *6 (D.N.J. 2019) (“While Jarvis emphasizes that Defendants made it clear that he was not free to leave, and even used force to restrain him, it is well-established that ‘a *Terry* stop is a seizure, and one seized is by definition not free to leave.’  As Jarvis was properly seized, Defendants had no obligation, as Jarvis suggests, to ‘giv[e] the Plaintiff the opportunity to walk away . . . .’”) (first alteration in original) (citations omitted).

Here, Officer Grossman was performing a *Terry* stop supported by reasonable suspicion, C.L. attempted to walk away from him before the stop was complete, and Officer Grossman responded by using force to prevent C.L. from leaving.  Even accepting C.L.’s contention that Officer Grossman eventually tackled him to the ground (as opposed to causing an accidental fall), this was not an arrest.  *Cf. Feathers v. Aey*, 319 F.3d 843, 851-52 (6th Cir. 2003) (“[T]he officers’ pursuit and seizure of Feathers as he moved toward and opened the door into his house were necessary in order to complete their investigative detention under *Terry*.  Although Feathers explains that he was not attempting to flee . . . his acknowledged motions . . . gave the officers sufficient reason to believe that he was fleeing and that the only way to complete their *Terry* stop would be to seize him.”) (footnote and citation omitted); *United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976) (“Having lawfully stopped Purry[,] Officer Swygert was entitled to maintain the status quo momentarily while obtaining more information and in maintaining the status quo he was entitled to use reasonable force. . . .  [W]hen Purry attempted to frustrate further inquiry [by pulling away after the officer placed an arm on him] Swygert was not required to shrug his shoulders and allow the suspected criminal to walk away.  The handcuffing was an

appropriate method of maintaining the status quo while further inquiry was made.") (citations and internal quotation marks omitted); *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (citing *Purry* with approval).

The Ninth Circuit's earlier decision in this case does not compel a different result. As discussed, the Ninth Circuit assumed, for purposes of its analysis, that Officer Grossman's investigation "had run its course" once he saw that C.L. was holding a piece of string "and there was no basis to support continuation of the stop" after that point. *C.L.*, 798 F. App'x at 1016. If those were still the facts, C.L.'s subsequent attempt to walk away from Officer Grossman would have been permissible (because the *Terry* stop had already ended) and Officer Grossman would not have been entitled to use force against C.L. to prevent him from walking away—an individual's decision to calmly walk away from a police officer during a consensual encounter does not create reasonable suspicion to detain the individual. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business."); *United States v. Smith*, 633 F.3d 889, 894 (9th Cir. 2011) ("Had [Smith] simply continued to go about his business, or walked away, Officer Dominguez would not have had reasonable suspicion to seize him."); *Amili v. City of Tukwila*, 31 F. Supp. 3d 1274, 1279 (W.D. Wash. 2014) ("Plaintiffs walking away could not contribute to the reasonable-suspicion calculus . . . ."). But the facts are now different—the evidence proffered by Officer Grossman establishes that the investigation had not run its course at the time C.L. made his second walkaway attempt, which in turn means Officer Grossman was entitled to use force to keep C.L. from leaving.

These factors distinguish this case from *Sialoi v. City of San Diego*, 823 F.3d 1223 (9th Cir. 2016), which the Ninth Circuit identified as the clearly established law bearing on Count One. In *Sialoi*, although the defendant police officers "were justified in initiating an investigatory stop of [a group of] teenagers after they spotted what they believed to be a gun in [one teenager's] hand," "[t]he police determined almost immediately . . . that the gun was, in fact, a toy, and at that point any suspicion that the teenagers were engaged in a

crime dissipated." *Id.* at 1232. Despite that determination, the officers proceeded to "handcuff[] all three [teenagers] and place[] them in the back of a police car *after* learning that the item . . . was a toy." *Id.* at 1233. The Ninth Circuit concluded the officers were not entitled to qualified immunity with respect to the teenagers' § 1983 claim for unlawful seizure/arrest because, "[b]efore handcuffing the three boys and placing them in a police car, the officers knew that the item . . . was a mere toy, knew that none of the boys possessed a gun, and were aware of no other even remotely suspicious activity in which any of the boys had engaged or were engaging" and, "[f]or these reasons, no reasonable officer would have concluded that probable caused existed to arrest the teenagers." *Id.* Here, in contrast, Officer Grossman continued to possess reasonable suspicion even after he saw the string in C.L.'s hand. Additionally, C.L. attempted to walk away before Officer Grossman completed the *Terry* stop. *Sialoi* does not preclude the use of force under those circumstances, much less hold that the use of such force transforms a *Terry* stop into an arrest.

In reaching this conclusion, the Court acknowledges that C.L. wouldn't have felt free to leave as Officer Grossman was grabbing his arm, attempting to handcuff him, taking him to the ground, and laying on top of him. But as discussed above, an inherent aspect of a *Terry* stop, which distinguishes such a stop from a consensual encounter, is that the individual is "not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439. Thus, for purposes of assessing whether a *Terry* stop transformed into an arrest, the question isn't simply whether the suspect's freedom to leave was curtailed at any point during the encounter—rather, the question is whether the intrusive measures "would cause a reasonable person to feel that he or she will not be free to leave *after brief questioning*—i.e., that indefinite custodial detention is inevitable." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (emphasis added). This standard is not satisfied where, as here, the use of force is to prevent the suspect from leaving so the officer may complete the *Terry*-style brief questioning. *United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. 1977) ("A police officer attempting to make an

investigatory detention may properly display some force when it becomes apparent that an individual will not otherwise comply with his request to stop, and the use of such force does not transform a proper stop into an arrest.").

Finally, the encounter did not transform into an arrest after Ms. Craglow arrived, explained that C.L. was autistic, and offered a benign explanation for C.L.'s possession of the string. Officer Grossman was not required to uncritically accept this explanation and it did not extinguish the reasonable suspicion that persisted by virtue of his drug recognition training and experience with inhalants being soaked into strings. *Cf. Pistilli v. Upper Darby Township*, 2015 WL 2237022, *4 (E.D. Pa. 2015) ("Pistilli also contends that Detective McGoldrick disregarded [bystander] Brooks's statements, which . . . should have negated any probable cause to arrest her and prompted Detective McGoldrick to review the surveillance video. However, police officers are not required to believe or disbelieve statements of bystanders when executing an arrest.").

Additionally, Officer Grossman continued detaining C.L. for only a brief period of time after Ms. Craglow entered the scene. The time stamp on the video reflects that Ms. Craglow explained that C.L. was stimming at 3:07, explained that C.L. was autistic at 3:12, and explained that C.L. uses the string to stim at 3:41. Less than a minute later, at 4:30, a backup officer arrived, and soon afterward Officer Grossman helped C.L. to his feet, conducted a final check for a weapon, and then released C.L. and allowed C.L. to sit by Ms. Craglow at 5:06. Even if it is possible, in hindsight, to say that Officer Grossman could or should have released C.L. more quickly during this sequence, Ninth Circuit law does not support the conclusion that the less-than-two-minute period of additional restraint (while waiting for backup) transformed what was a permissible *Terry* stop into an arrest. Although the Ninth Circuit has, to be clear, rejected the notion "that all detentions of 20 minutes [or less] are *per se* reasonable," *Liberal v. Estrada*, 632 F.3d 1064, 1080 (9th Cir. 2011) (emphasis added), it has still required much more than the showing here. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("[O]ur cases impose no rigid time limitation on *Terry* stops."); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1193 n.13 (9th

Cir. 2015) (rejecting the argument that, "even if the evidence supported a finding that the officers had the reasonable suspicion for seizing and frisking the plaintiffs required by *Terry*, the length of the field show-up (30–45 minutes) transformed their detention from a *Terry* stop into an arrest"); *Gallegos*, 308 F.3d at 989 ("[D]etaining Gallegos for forty-five to sixty minutes . . . fell within the bounds of a permissible investigatory stop."); *Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995) ("[P]ointing a gun at Allen, forcing him to lie on the ground, handcuffing him, and detaining him in a police vehicle . . . in a period not exceeding 24 minutes . . . was not unreasonable for a *Terry* stop and did not amount to an arrest."). *Cf. United States v. DeBerry*, 76 F.3d 884, 885 (7th Cir. 1996) ("No doubt at some point DeBerry's forced immobilization with his hands on the hood of the police cruiser would have turned the stop into an arrest . . . . [b]ut two minutes is not that point.").

Given these conclusions, it is unnecessary to address Officer Grossman's alternative arguments that he had probable cause to arrest C.L. for violating A.R.S. § 13-2508(A) and/or that he was justified in arresting C.L. pursuant to Arizona's community caretaker custody statute, A.R.S. § 36-525. The undisputed evidence establishes that the encounter was a *Terry* stop supported by reasonable suspicion, so C.L. cannot prevail on his § 1983 claim predicted on an illegal seizure/false arrest theory.

### 3. Clearly Established Law

Alternatively, even if a reasonable jury could find that the *Terry* stop transformed into an arrest unsupported by probable cause, Officer Grossman would still be entitled to qualified immunity on Count One because there was no clearly established law in July 2017 demonstrating that the particular conduct at issue here was illegal.

"The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2008 (2017) (per curiam) (internal quotation marks omitted). "The Supreme Court has repeatedly instructed [courts to] examine whether the violative nature of *particular* conduct is clearly established by

controlling precedent, not whether the conduct violates a general principle of law." *Sharp v. County of Orange*, 871 F.3d 901, 910 (9th Cir. 2017) (internal quotation marks omitted). "Except in the rare case of an 'obvious' instance of constitutional misconduct . . . , [a plaintiff] must *identify a case* where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.  In other words, [a plaintiff] must point to prior case law that articulates a constitutional rule specific enough to alert *these* [defendants] *in this case* that *their particular conduct* was unlawful.  To achieve that kind of notice, the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* at 911 (internal quotation marks omitted).  *See also Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016) ("[A] plaintiff need not find a case with identical facts in order to survive a defense of qualified immunity . . . .  But . . . the farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional.  So long as even that much can be said for the officials, they are entitled to qualified immunity.").

In its earlier decision in this case, the Ninth Circuit identified *Sialoi* as the case that would have imparted notice to Officer Grossman that his seizure of C.L. violated the Fourth Amendment.  *C.L.*, 798 F. App'x at 1016.  But as discussed above in Part II.B.2.c, although *Sialoi* clearly establishes that it is unconstitutional to arrest and handcuff an innocent suspect after the suspect has been exonerated and reasonable suspicion has dissipated, those are not the facts of this case now that it has progressed past the pleading stage and reached summary judgment.  Additionally, the suspects in *Sialoi* did not walk away before the *Terry* stop was complete.  *Sialoi*, 823 F.3d at 1236 ("[N]othing the remaining plaintiffs did once the officers arrived offered any basis for detaining them.").  Thus, Plaintiffs must identify some other case that would have placed Officer Grossman on notice that the particular conduct at issue here—grabbing, attempting to handcuff, and then tackling and laying on top of a suspect who attempted to walk away in the middle of a *Terry* stop, and continuing

1   to detain the suspect for about two minutes after a third party arrived to offer exculpatory

2   statements—constituted an illegal seizure.

3        Plaintiffs have not attempted to do so.  Nor has the Court uncovered any such case

4   through its own research.[8]  Thus, at a minimum, Officer Grossman is entitled to summary

5   judgment on Count One based on the second prong of the qualified-immunity analysis.

6        ## C.    **Count Two: Excessive Force**

7        When the defense of qualified immunity is raised in a § 1983 action involving a

8   claim of excessive force, the first prong of the qualified-immunity analysis requires an

9   assessment of whether the force used was "objectively reasonable," which "is determined

10  by an assessment of the totality of the circumstances."  *Green v. City & County of San*

11  *Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).  The reasonableness of the use of force

12  "must be judged from the perspective of a reasonable officer at the scene, rather than with

13  the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The inquiry

14  is "whether the officers' actions are 'objectively reasonable' in light of the facts and

15  circumstances confronting them, without regard to their underlying intent or motivation."

16  *Id.* at 397.  "The calculus of reasonableness must embody allowance for the fact that police

17  officers are often forced to make split-second judgments—in circumstances that are tense,

18  uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

19  situation."  *Id.*  "Neither tackling nor punching a suspect to make an arrest necessarily

20  constitutes excessive force."  *Blankenhorn*, 485 F.3d at 477.  "Because this inquiry is

21  inherently fact specific, the determination whether the force used to effect an arrest was

22  reasonable under the Fourth Amendment should only be taken from the jury in rare cases."

23

24  ---

    [8]    The tentative ruling identified *Lambert* as an additional case, on top of *Sialoi*, that
25  could serve as the clearly established law supporting C.L.'s claim in Count One.  But given
    the clarification in this order that Officer Grossman was entitled to use force to prevent
26  C.L. from walking away in the middle of the *Terry* stop, *Lambert* is no longer a valid
    comparator.  There, the Ninth Circuit held that "*if the Terry-stop suspects are cooperative*
27  and the officers do not have specific information that they are armed or specific information
    linking them to a recent or inchoate dangerous crime, the use of . . . aggressive and highly
28  intrusive tactics is not warranted."  98 F.3d at 1192 (emphasis added).  This principle does
    not clearly establish that it is unconstitutional to use force against a suspect who is
    uncooperative, *i.e.*, walks away in the middle of the stop.

*Green*, 751 F.3d at 1049 (internal quotation marks omitted).

Meanwhile, the second prong of the qualified-immunity analysis in excessive force cases "requires two separate determinations: (1) whether the law governing the conduct as issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." *Id.* at 1052. This is generally a question of law, but genuine issues of material fact, such as how much force was used, may defeat a claim of qualified immunity at the summary judgment stage. *Id.* "Where such disputes exist, summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party." *Blankenhorn*, 485 F.3d at 477.

### 1. Constitutional Violation

Defendants argue that the amount of force Officer Grossman used against C.L. was "minimal" and reasonable because (1) "taking hold of C.L.'s wrist and upper arm in an attempt to handcuff a fleeing suspect is [not] excessive"; (2) an "accidental fall does not support a claim for excessive force"; and (3) "simply holding C.L. on the ground until back-up arrives does not offend the Constitution or violate clearly established law." (Doc. 155 at 18-19, emphasis and footnote omitted.) Defendants also argue that Officer Grossman's "use of force occurred only after C.L. attempted to leave the scene of the investigation and, even then, was limited to the force necessary to maintain his physical presence at the scene, and overcome his flight and resistance." (*Id.*)

C.L. responds that Officer Grossman's claim of an "accidental fall" is disputed, as C.L. has consistently testified that he was "tackled" and there is circumstantial evidence to support his version of events, namely that "[b]y the end of this encounter, C.L. had contusions and scrapes on his face, both sides of his back, both shoulders, his knees, and damage to his ankle that required surgery." (Doc. 167 at 20.) Defendants reply that C.L.'s "claimed injuries . . . are consistent with a minimal use of force, and . . . Officer Grossman's undisputed testimony that the fall to the ground and contact with a tree was not an intentional act on Officer Grossman's part, but was the product of C.L. pulling them both

- 38 -

1    to the ground as C.L. resisted."  (Doc. 173 at 12-13.)  Defendants also argue that "Officer

2    Grossman's decision to maintain physical control of [C.L.] until expected backup arrived

3    was reasonable in light of C.L.'s attempt to leave the scene of the investigation, the

4    difficulties trying to handcuff him, and C.L.'s physical and verbal resisting and struggling."

5    (*Id.*)

6           "Characterizing the amount of a non-lethal force can often depend on specific

7    factual circumstances.  The same is true involving take-downs."  *Rice v. Morehouse*, 989

8    F.3d 1112, 1121 (9th Cir. 2021) (citations omitted).  Here, although Officer Grossman was

9    permitted to use force to prevent C.L. from walking away in the middle of a *Terry* stop

10   (and the use of such force did not transform the *Terry* stop into an arrest), it doesn't follow

11   that the quantum of force used by Officer Grossman was necessarily permissible.  *Cf.*

12   *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) ("Considering the facts

13   in the light most favorable to the plaintiff, a jury could decide that Officer Horton's actions

14   violated the Fourth Amendment's prohibition on excessive force.  LaLonde admits that he

15   initially resisted arrest . . . [but] if the extent of the injury to LaLonde's back is serious

16   enough, a jury could conclude that Horton used force in excess of what was reasonable,

17   even if LaLonde had been resisting at the time.  Also, another factor weighing in LaLonde's

18   favor is the fact that he was being arrested for a relatively minor offense.").[9]

19   ───────────────────
     [9]     Many courts have recognized that the amount of force used during a *Terry* stop may

20   be constitutionally excessive without transforming the encounter into an arrest.  *See, e.g.,*
     *Patel v. City of Madison, Ala.*, 2018 WL 1881326, *14, 21-22 (N.D. Ala. 2018) (granting

21   summary judgment on false arrest claim, because "no reasonable jury could concluded that
     Officer Parker arrested Patel" and "this case looks more like a *Terry* stop gone awry than

22   a formal arrest," but denying summary judgment on excessive force claim because,
     "[v]iewing the evidence in the light most favorable to the non-movant, Patel, Officer Parker

23   violated Patel's clearly established rights not to be subjected to excessive force during the
     course of a *Terry* stop"); *Turner v. Bruce*, 2019 WL 286966, *2-3 (W.D. Wisc. 2019)

24   (barring plaintiff from "present[ing] a theory of false arrest at trial," because the underlying
     encounter was "plainly . . . a *Terry* stop, not an arrest," but holding that plaintiff could

25   pursue excessive force claim at trial because "there is no doubt the police may not use
     excessive force" during a *Terry* stop); *Njaka v. Wright County*, 560 F. Supp. 2d 746, 758

26   (D. Minn. 2008) ("Here, on the facts as alleged—that the investigating officer 'pinched'
     Plaintiff's testicle while patting him down—the Complaint states a claim for the excessive

27   use of force in conducting a *Terry* search.") (citation omitted).  *See generally Cortez v.*
     *McCauley*, 478 F.3d 1108, 1127 n.23 (10th Cir. 2007) (en banc) ("[I]n cases involving

28   claims of both unlawful detention and excessive force arising from a single encounter, it is
     necessary to consider both the justification the officers had for the detention and the degree
     of force they used to effect it. . . .  These two inquiries are separate and independent, though

As for whether the amount of force used by Officer Grossman was excessive, several factual disputes preclude a ruling in his favor at this stage.  Defendants' excessive-force arguments are explicitly predicted on the notion that the fall was "accidental" (Doc. 155 at 19) and that Officer Grossman kept C.L. pinned because of his "physical and verbal resisting and struggling" (Doc. 173 at 12-13).  But both of those issues are the subject of legitimate factual disputes in light of C.L.'s testimony and the limitations of the video footage.  Construing the facts in a light most favorable to C.L., a reasonable jury could find that C.L. stopped attempting to walk away once Officer Grossman grabbed his arm, yet Officer Grossman proceeded to tackle C.L. (a 14-year-old boy) into a tree and then roughly pin C.L. against the ground for several minutes, even though C.L. was not struggling, ultimately causing C.L. to suffer an array of injuries, including an ankle injury that required surgery.  These facts are similar to the facts of *LaLonde*, and there the Ninth Circuit concluded that the plaintiff "had the right to have the jury assess the evidence supporting this claim of excessive force." 204 F.3d at 959.  So, too, here.  *Cf. Bryan v. MacPherson*, 630 F.3d 805, 828-29 (9th Cir. 2010) ("While the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others.") (internal quotation marks omitted); *Morelli v. Webster*, 552 F.3d 12, 24 (1st Cir. 2009) (reversing grant of summary judgment in favor of police officer on excessive force claim, even though the officer was entitled to qualified immunity on separate "unlawful detention" claim, because "the facts, seen through the prism of the plaintiff's account, simply do not justify yanking the arm of an unarmed and non-violent person, suspected only of the theft of $20, and pinning her against a wall for three to four minutes with sufficient force to tear her rotator cuff").  In short, a reasonable jury could find that Officer Grossman's use of force was excessive and unreasonable.  The jury must

---

the evidence may overlap"); *id.* at 1130-32 (recognizing the "Fourth and Fourteenth Amendment right to be free from the use of excessive force in the context of an investigative detention").  Thus, there is no tension between the grant of summary judgment in Officer Grossman's favor on Count One and the denial of summary judgment on Count Two.

1    resolve the factual disputes and weigh Officer Grossman's and C.L.'s credibility to

2    determine whose version of events should be believed.  *Cf. Rice*, 989 F.3d at 1125 ("Haug's

3    opinion relies on the conclusion that Rice was physically resisting his arrest.  But . . . that

4    issue is genuinely disputed and not directly resolved by the dash-cam video.  Thus, Haug's

5    ultimate conclusions regarding the propriety of the take-down depends on two critical

6    factual issues that cannot be resolved at summary judgment.").

7                    2.    Clearly Established Law

8            Defendants argue that C.L. has not identified any cases that "would have put Officer

9    Grossman on notice that he was constitutionally obligated to act in a different way than he

10   did."  (Doc. 173 at 13.)  C.L. mostly relies on the Ninth Circuit's decision at the motion-

11   to-dismiss stage.  (Doc. 167 at 19.)

12           In its earlier decision in this case, the Ninth Circuit identified *Liberal v. Estrada*,

13   632 F.3d 1064 (9th Cir. 2011), as the clearly established law bearing on C.L.'s claim in

14   Count Two.  In *Liberal*, the court held that officers were not entitled to qualified immunity

15   on an excessive force claim where "the use of force against Plaintiff occurred *after* he had

16   complied with [the officer's] requests," "Plaintiff did not pose an immediate threat to

17   anyone's safety and was complying with the officer's request," the plaintiff "was not

18   'actively' attempting to evade arrest by flight," and there "was no evidence to suggest that

19   Plaintiff was either armed or dangerous."  *Id.* at 1079.  Here, even though Officer Grossman

20   was justified in using force to prevent C.L. from leaving before the *Terry* stop was

21   complete, the jury could conclude that C.L. stopped resisting and attempting to leave after

22   Officer Grossman grabbed him yet Officer Grossman then proceeded to use other forms of

23   force (tackling, pinning, etc.) that were unnecessary and unwarranted.  *Liberal* would have

24   provided notice to Officer Grossman that such conduct was unconstitutional.  So would

25   have *LaLonde*.  "The court must deny the motion for judgment as a matter of law if

26   reasonable jurors could believe that Defendants violated [the plaintiff's] constitutional

27   right, and the right at issue was clearly established."  *Torres*, 548 F.3d at 1210.  Officer

28   Grossman is thus not entitled to summary judgment on C.L.'s excessive force claim.

1

D.   **Count Four: ADA Claim**

2     Because both parties affirmatively move for summary judgment (or partial summary

3    judgment) on C.L.'s ADA claim against the City, the Court will analyze the parties'

4    arguments from both motions together.

5          1.   Legal Standard

6     Title II of the ADA provides: "[N]o qualified individual with a disability shall, by

7    reason of such disability, be excluded from participation in or be denied the benefits of the

8    services, programs, or activities of a public entity, or be subjected to discrimination by any

9    such entity." 42 U.S.C. § 12132.  As for the phrase "public entity," the Ninth Circuit has

10   stated that it "encompasses all facets of state government," *Armstrong v. Wilson*, 124 F.3d

11   1019, 1023 (9th Cir. 1997), including "local law enforcement agencies." *Lee v. City of Los*

12   *Angeles*, 250 F.3d 668, 691 (9th Cir. 2001), *overruled on other grounds by Galbraith v.*

13   *County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).   As for the phrase "services,

14   programs, or activities," the Ninth Circuit has stated that this "broad language brings within

15   its scope anything a public entity does." *Id.* (internal quotation marks omitted).  The "focus

16   of the inquiry . . . [is] whether it is a normal function of a governmental entity." *Barden v.*

17   *City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (internal quotation marks

18   omitted).

19    In *Sheehan v. City & County of San Francisco*, 743 F.3d 1211 (9th Cir. 2014), the

20   Ninth Circuit concluded, in light of the broad manner in which it had previously interpreted

21   these statutory phrases, that "[t]he ADA therefore applies to arrests" conducted by local

22   law enforcement agencies. *Id.* at 1232.  In a related vein, the *Sheehan* court recognized

23   that a plaintiff may assert a claim under Title II of the ADA for "wrongful arrest, where

24   police wrongly arrest someone with a disability because they misperceive the effects of

25   that disability as criminal activity." *Id.*[10]  Although the Ninth Circuit has never expressly

26   _____

[10]     The *Sheehan* court acknowledged that the question "whether the ADA applies to
27   arrests . . . is a matter of some disagreement among other circuits." *Id.* at 1231.  Indeed,
     after *Sheehan* was decided, the defendant asked the Supreme Court to resolve this circuit
28   split.  The Supreme Court agreed to do so, only for the defendant to decline to pursue the
     ADA issue in its merits briefing, which in turn caused the Supreme Court to conclude that
     "it would [not] be prudent to decide the question in this case." *City and County of San*

1  delineated the elements of such a claim, district courts within the Ninth Circuit have

2  concluded that, "[t]o prevail on a theory of wrongful arrest under the ADA, [a plaintiff]

3  must prove that (1) he was disabled; (2) the officers knew or should have known he was

4  disabled; and (3) the officers arrested him because of legal conduct related to his

5  disability." *Lawman v. City & County of San Francisco*, 159 F. Supp. 3d 1130, 1147 (N.D.

6  Cal. 2016). Additionally, "exigent circumstances inform the reasonableness analysis under

7  the ADA, just as they inform the distinct reasonableness analysis under the Fourth

8  Amendment." *Sheehan*, 743 F.3d at 1232.

9                2.   <u>Parties' Arguments</u>

10        Defendants' primary argument (both in support of their motion for summary

11  judgment and in response to C.L.'s partial motion for summary judgment) is that the ADA

12  does not apply to investigative detentions. (Doc. 155 at 19-22; Doc. 174 at 7-12.)[11]

13  Defendants further argue that the ADA claim fails because C.L. "was not [seized] because

14  of legal conduct related to his disability," but instead because he unlawfully attempted to

15  leave the investigation and resisted arrest, and because Officer Grossman did not know or

16  could not reasonably have known that C.L. was disabled "in the sixteen seconds that they

17  interacted before C.L. turned to leave." (Doc. 155 at 22-25; Doc. 174 at 13-15.)

18  Defendants also contend that C.L. cannot prove intentional discrimination. (Doc. 174 at

19  11-13.)

20        C.L. argues that Ninth Circuit law and federal regulations extend the ADA's

21  protections to any seizure by law enforcement, however characterized: "The ADA applies

22  to all law enforcement activities, including arrests and *Terry* stops." (Doc. 158 at 8-12.)

23  C.L. also argues that, because he is only moving for partial summary judgment on the

24  declaratory and injunctive relief portions of his ADA claim, he need not prove intentional

---

25  *Francisco, Cal. v. Sheehan*, 575 U.S. 600, 610 (2015). *See also id.* at 621 (Scalia, J.,
   concurring in part and dissenting in part) (describing the defendant's strategy as
26  "snookering"). Thus, *Sheehan*'s holding on this point remains valid law in the Ninth
   Circuit.

27  [11]    Defendants also contend that *Sheehan*'s discussion of wrongful arrests was "dicta"
   but, to their credit, acknowledge they are "swimming upstream" on this issue. (Doc. 155
28  at 22 n.11.)

1    discrimination and may leave the question of compensatory damages to the jury.  (*Id.* at

2    12-13; Doc. 176 at 10-12.)  On the merits, C.L. argues that there is no dispute that he is

3    "severely disabled due to his autism," that Officer Grossman "detained and arrested [C.L.]

4    for conduct related to his disability" (*i.e.*, stimming), and that C.L. was seized when ordered

5    to not walk away from Officer Grossman.  (*Id.* at 13-15; Doc. 176 at 8-10.)

6                    3.    Analysis

7                          a.    **Seizures By Law Enforcement**

8           Although *Sheehan* did not expressly address whether Title II of the ADA applies to

9    wrongful investigative *detentions* (as contrasted with wrongful *arrests*), the Court agrees

10   with C.L. that this conclusion flows inexorably from *Sheehan*'s logic.  The Ninth Circuit

11   has repeatedly stated, not just in *Sheehan* but elsewhere, that Title II applies to "anything

12   a public entity does."  *Barden*, 292 F.3d at 1076.  During oral argument, Defendants'

13   counsel correctly acknowledged that investigative detentions are something "a public

14   entity does."  It follows that, under *Sheehan*, a disabled plaintiff may assert an ADA claim

15   premised on the theory that he was wrongfully subjected to an investigative detention due

16   to the misperception of the effects of his disability as criminal activity.  Although

17   Defendants raise strong arguments as to whether this should be the law (and/or whether

18   *Sheehan* reached the correct textual interpretation of the law) and advance several policy

19   arguments in support of their position (*see, e.g.*, Doc. 155 at 21-22 & 22 n.11; Doc. 174 at

20   10-12), this Court's limited role is to faithfully discern and apply existing Ninth Circuit

21   law.  *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are

22   bound by the law of their own circuit. . . . no matter how egregiously in error they may feel

23   their own circuit to be.").  Nor may Defendants avoid the applicable passages from *Sheehan*

24   by characterizing them as dicta.  *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir.

25   2019) ("Where a panel confronts an issue germane to the eventual resolution of the case,

26   and resolves it after reasoned consideration in a published opinion, that ruling becomes the

27   law of the circuit, regardless of whether doing so is necessary in some strict logical

28   sense. . . .  In other words, well-reasoned dicta is the law of the circuit . . . .") (cleaned up).

1    Given this conclusion, it is unnecessary to address the relevance or applicability of federal

2    regulations or DOJ guidance on the subject.

3                                    b.    **The Merits**

4            The parties dispute several issues, including which elements a plaintiff must prove

5    to prevail on a wrongful detention claim under the ADA, but the Court need not resolve

6    those issues now due to the presence of several disputes of material fact concerning

7    whether exigent circumstances existed in the interaction between C.L. and Officer

8    Grossman.  As noted, the Ninth Circuit recognized in *Sheehan* that "exigent circumstances

9    inform the reasonableness analysis under the ADA, just as they inform the distinct

10   reasonableness analysis under the Fourth Amendment."  743 F.3d at 1232.  Just as there

11   are several disputes of material fact that preclude summary judgment on C.L.'s § 1983

12   claim for excessive force, there are disputes of fact that bear on C.L.'s ADA claim,

13   including whether C.L.'s gesturing behind his back during the early stages of the encounter

14   (arguably before it even became a *Terry* stop) could have caused Officer Grossman to fear

15   that C.L. had a weapon and take exigent action based on that belief.  Although the Court

16   construed the facts in a light most favorable to C.L. as the non-movant with respect to the

17   § 1983 claims, the Court may not do so here, where C.L. is a movant.  Just as the parties'

18   diverging narratives about what exactly occurred between C.L. and Officer Grossman

19   precluded summary judgment as to C.L.'s § 1983 claim for excessive force, neither party

20   is entitled to summary judgment on C.L.'s ADA claim.[12]

21

22   [12]    In C.L.'s motion for partial summary judgment, he urges the Court to "find a
     violation [under the ADA] under either" the wrongful arrest or failure-to-accommodate
23   theories articulated in *Sheehan*.  (Doc. 158 at 13.)  In support of this claim, C.L. argues that
     the City "never implemented any training to avoid the kind of harm that befell [C.L.]."  (*Id.*
24   at 16-17.)  In response, Defendants argue that C.L.'s "wrongful arrest claim under the ADA
     is strictly limited to the allegation that Officer Grossman wrongfully arrested C.L. because
25   of his disability" and that, "[a]lthough [C.L.] originally pled an ADA reasonable
     accommodation claim . . . he did not argue that the ADA reasonable accommodation claim
26   was based on an alleged failure to train."  (Doc. 174 at 16.)  In a related vein, Defendants
     argue that, because the Court previously dismissed C.L.'s reasonable accommodation
27   claim, any failure-to-train claim under the ADA has not been pled and thus cannot be
     asserted.  (*Id.*)  C.L. does not address Defendants' arguments in his reply.  The Court agrees
28   with Defendants.  To the extent C.L. is raising a failure-to-train theory as part of a
     reasonable accommodation claim, he may not do so because this claim has been dismissed.

- 45 -

1

     E.    **Count Five: Battery**

2

     Count Five is a state-law claim for battery against Officer Grossman.  (Doc. 92 ¶¶

3

169-74.)   Defendants argue this claim fails because a state statute, A.R.S. § 13-409,

4

"provides immunity [from] civil suit for justified uses of force."  (Doc. 155 at 25-26.)

5

Defendants argue that Officer Grossman's use of force was justified in "preventing [C.L.'s]

6

escape" while detaining him.

7

     A.R.S. § 13-409 provides:

8

     A person is justified in threatening or using physical force against another if
in making or assisting in making an arrest or detention or in preventing or

9

assisting in preventing the escape after arrest or detention of that other
person, such person uses or threatens to use physical force and all of the

10

following exist:

11

     1.    A reasonable person would believe that such force is immediately

12

          necessary to effect the arrest or detention or prevent the escape.

13

     2.    Such person makes known the purpose of the arrest or detention or
believes that it is otherwise known or cannot reasonably be made

14

          known to the person to be arrested or detained.

15

     3.    A reasonable person would believe the arrest or detention to be lawful.

16

"If the officer's use of force is justified under § 13-409, the officer is immune from civil

17

liability."  *Ryan v. Napier*, 425 P.3d 230, 239 (Ariz. 2018).  "Importantly, although the use

18

of force can be justified at its commencement, it loses legal justification at the point the

19

force becomes unnecessary."  *Id.*  "An officer's use of physical force is excessive if it goes

20

beyond that which is immediately necessary to effect the arrest or detention."  *State v.*

21

*Matthews*, 428 P.3d 198, 203 (Ariz. Ct. App. 2018) (internal quotation marks omitted).

22

Because A.R.S. § 13-409 is an affirmative defense, Defendants have the burden of

23

establishing it by a preponderance of the evidence.  *Pfeil v. Smith*, 900 P.2d 12, 14 (Ariz.

24

Ct. App. 1995).

25

     As discussed in Part II.C above, there are several material disputes of fact

26

concerning whether Officer Grossman's use of force, although initially justified, later

27

became excessive.  Accordingly, summary judgment on Count Five is inappropriate.  *See,*

28

*e.g.*, *Castro v. Ariz. Dep't of Pub. Safety*, 2020 WL 9600817, *12 (D. Ariz. 2020) ("When

considering the evidence in the light most favorable to Plaintiff, there are disputed issues of material fact precluding summary judgment on Plaintiff's state law claims on the basis of Arizona's justification statutes."), *aff'd sub nom. Castro v. Martin*, 2021 WL 1853363 (9th Cir. 2021); *Parish v. Lansdale*, 2019 WL 4849612, *16 (D. Ariz. 2019) ("Viewing the evidence in the light most favorable to Parish, the Court will deny the Officers' motion for summary judgment on the assault and battery claims.  As noted above, questions of fact exist regarding the existence of probable cause and application of A.R.S. § 13-409's justification defense."); *Joseph v. Dillard's, Inc.*, 2009 WL 5185393, *8 (D. Ariz. 2009) ("Summary judgment on this issue is inappropriate for the same reason it is inappropriate on the issue of qualified immunity from the section 1983 excessive force claim.  In light of the disputes over whether Plaintiff attempted to assault Villarreal and whether she was resisting arrest, it cannot be said that a reasonable person would believe that such force [was] immediately necessary to effect the arrest or that a reasonable person would believe the arrest . . . to be lawful.") (alterations in original) (internal quotation marks omitted).

F.    **Count Six: Negligent Supervision And Training**

Count Six is a state-law claim for negligent supervision and training against Lieutenant Arlak, Chief Hall, and the City.  (Doc. 92 ¶¶ 175-79.)

1.    <u>Notice Of Claim</u>

Defendants argue, in somewhat cursory fashion, that C.L.'s claims for negligent supervision and training against Lieutenant Arlak and the City fail because C.L. failed to comply with Arizona's notice of claim statute, A.R.S. § 12-821.01.  (Doc. 155 at 30.)

A.R.S. § 12-821.01(A) provides, in relevant part:

> Persons who have claims against a public entity, public school or a public employee shall file claims with the person or persons authorized to accept service for the public entity, public school or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. . . .  Any claim that is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

Notwithstanding the requirements of § 12-821.01(A), however, "a minor . . . may file a

1   claim within one hundred eighty days after the disability ceases." *Id.* § 12-821.01(D).

2                           a.      **Lieutenant Arlak**

3          As for Lieutenant Arlak, Defendants argue that C.L.'s notice of claim was untimely

4   because it was provided after the 180-day period.  (*Id.*)  C.L. responds that his notice of

5   claim to Lieutenant Arlak was timely because the 180-day period does not begin to accrue

6   until a minor reaches the age of eighteen.  (Doc. 167 at 28-29.)  Defendants do not respond

7   to this argument in reply.  (Doc. 173 at 15-16.)

8          C.L. is correct that his notice of claim was timely provided to Lieutenant Arlak.

9   Although A.R.S. § 12-821.01 "generally requires persons having claims against public

10  entities or employees to file pre-litigation notices within 180 days after the claim

11  accrues, . . . minors may file such notices within 180 days after turning eighteen."  *Est. of*

12  *DeSela v. Prescott Unified Sch. Dist. No. 1*, 249 P.3d 767, 770 (Ariz. 2011).  Defendants

13  do not dispute that C.L. provided a notice of claim to Lieutenant Arlak, and it is undisputed

14  that C.L. is still a minor.

15                          b.      **The City**

16         As for the City, Defendants argue the notice of claim was not properly served

17  because "only Chief Hall was personally served with the City's notice of claim" and the

18  notice should have been personally served on the City's Clerk.  (Doc. 155 at 30.)  C.L.

19  responds that he "served the Clerk of the City via certified mail on January 16, 2018."

20  (Doc. 167 at 28.)  C.L. argues that this service complied with the requirements of § 12-

21  821.01, as the Court held in a previous order.  (*Id.*)  Defendants reply that the case upon

22  which C.L. relies for establishing that certified mail was a sufficient service method, *Lee*

23  *v. State*, 182 P.3d 1169 (Ariz. 2008), is no longer good law because Arizona Rule of Civil

24  Procedure 4.1 no longer authorizes service by mail.  (Doc. 173 at 15-16.)

25         As the Court held in a previous order, "it was permissible for C.L. to use the mail

26  to serve his notice of claim on the City."  (Doc. 40 at 18-19.)  The Court now reiterates

27  what it held previously—the Arizona Supreme Court's holding in *Lee* was not tethered to

28  the proper method of service set out in the Arizona Rules of Civil Procedure but, rather, to

the Arizona Rules' prescriptions as to who is authorized to accept service for a public entity or employee. *Lee*, 182 P.3d at 1172 ("Claimants must file claims *with the person or persons authorized to accept service for the public entity or public employee* as set forth in the Arizona rules of civil procedure. Arizona Rules of Civil Procedure 4.1(h)-(j) clearly set forth the person or persons authorized to accept service for various public entities. By contrast, nothing in the rules defines how filing must occur. The rules do not prohibit mail as a form of filing nor do they indicate that mailing, though probative, is inadmissible to prove filing.") (citation and internal quotation marks omitted). *See also Fernandez v. City of Phoenix*, 2012 WL 1985682, *2 (D. Ariz. 2012) ("It is true that plaintiffs could have mailed their notice of claim and presented proof of proper mailing as evidence of actual receipt.") (citing *Lee*, 182 P.3d at 1173); *Reeves v. City of Show Low*, 2009 WL 1125414, *2 (D. Ariz. 2009) ("The initial, and decisive, issue here is not whether service of a notice of claim may be accomplished through the regular mail, it can . . . .") (citing *Lee*, 182 P.3d at 1173).

### 2.   Merits

"An employer is liable for the tortious conduct of its employee if the employer was negligent or reckless in hiring, supervising, or otherwise training the employee." *Russell v. Flores*, 2017 WL 564969, *6 (D. Ariz. 2017), *report and recommendation adopted*, 2017 WL 553129 (D. Ariz. 2017) (citation omitted). For negligent hiring, supervision, and training claims, "Arizona follows the Restatement (Second) of Agency § 213." *Krieg v. Schwartz*, 2015 WL 12669893, *9 (D. Ariz. 2015) (citing *Kassman v. Busfield Enters., Inc.*, 639 P.2d 353, 356 (Ariz. Ct. App. 1981)). Section 213 provides:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a)   in giving improper or ambiguous orders of [sic] in failing to make proper regulations; or
>
> (b)   in the employment of improper persons or instrumentalities in work involving risk of harm to others[;]
>
> (c)   in the supervision of the activity; or
>
> (d)   in permitting, or failing to prevent, negligent or other tortious

1   conduct by persons, whether or not his servants or agents, upon
2   premises or with instrumentalities under his control.

3   *Id.*  For an employer to be liable under any of these theories, "a court must first find that
4   the employee committed a tort."  *Krieg*, 2015 WL 12669893 at *9 (quoting *Kuehn v.
5   Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004)).  Once the underlying tort is established,
6   the employer may be liable "not because of the relation of the parties, but because the
7   employer antecedently had reason to believe that an undue risk of harm would exist
8   because of the employment."  *Quinonez for and on behalf of Quinonez v. Andersen*, 696
9   P.2d 1342, 1346 (Ariz. Ct. App. 1984) (quoting Restatement (Second) of Agency § 213,
10  cmt. d (1952)).

11                      a.      **Negligent Supervision**

12                              i.      <u>Legal Standard</u>

13          To prove negligent supervision, the plaintiff must show the employer knew or
14  should have known the employee was incompetent and that the employer subsequently
15  failed to supervise the employee, ultimately causing the harm at issue.  *Vasquez v. City of
16  Phoenix*, 2006 WL 1147716, *4 (D. Ariz. 2006) ("To prove negligent supervision and
17  retention, Plaintiff must show that the City knew or should have known that Officers Jones
18  and Kincannon were not competent police officers and that the City's retention of and
19  failure to supervise the officers caused injury to Plaintiff."); *Humana Hosp. Desert Valley
20  v. Superior Court of Ariz. in and for Maricopa Cnty.*, 742 P.2d 1382, 1386 (Ariz. Ct. App.
21  1987) ("To prove a negligent supervision theory, a plaintiff must establish that the hospital
22  knew or should have known that a physician was not competent to provide certain care and
23  that the hospital's failure to supervise the physician caused injury to the plaintiff.").  Put
24  another way, "the plaintiff must show that the defendant 'had a reason and opportunity to
25  act, . . . failed to adequately discharge his duty to supervise, and . . . thereby contributed to
26  the cause of the accident.'"  *Krieg*, 2015 WL 12669893 at *10 (quoting *Boomer v. Frank*,
27  993 P.2d 456, 461 (Ariz. Ct. App. 1999)).

28          …

1

ii.    Parties' Arguments

2          Defendants argue that C.L. "overstates [the] allegations regarding Officer

3   Grossman's record" and his competency.  (Doc. 155 at 29-30.)  Defendants put forth

4   evidence that Officer Grossman was described by his supervisor, Sergeant Erick Halim, as

5   "a good officer," smart, and "well liked by others." (Doc. 155-5 at 20, 22-23.)  Defendants

6   also proffer evidence that Officer Grossman was twice selected as "Officer of the Year"

7   and has received several other awards.  (*Id.* at 59-60; Doc. 155-12 at 8-17.)  Defendants

8   also argue that, although Officer Grossman was put on a Performance Improvement Plan

9   ("PIP") in 2011, he completed the PIP, and the only incident between the PIP and his

10  encounter with C.L. was when Officer Grossman showed body camera footage to a

11  civilian.  (Doc. 155 at 29.  *See also* Doc. 155-3 at 109-12.)

12         In response, C.L. points to several disciplinary infractions in Officer Grossman's

13  record, including (1) an incident that occurred on an unspecified date before March 2011

14  in which Officer Grossman grabbed and "wrestled [an individual] to the ground" and

15  deployed a "chemical agent to the subject['s] face twice before being able to gain

16  compliance," even though he could not provide articulation for the seizure (Doc. 155-11 at

17  9), (2) an incident in October 2016 in which Officer Grossman was "engaged in a fight

18  with a motorist" (*id.* at 16-17),[13] and (3) an incident that occurred on an unspecified date

19  before March 2011 in which Officer Grossman "entered a residence against the consent of

20  the homeowner and made an arrest" (*id.* at 9).  (Doc. 167 at 3, 27.)  Defendants reply that

21  "[a]ny alleged misconduct from 2010 and 2011 is remote, and was rectified at the time"

22  because Officer Grossman was put on (and successfully completed) a PIP in relation to

23  those incidents and there is "no evidence the City ignored misconduct, or failed to engage

24  in appropriate levels of discipline."  (Doc. 173 at 15.)

25         …

26         …

27

28

---

[13]     It is important to note that the disciplinary infraction for this incident appears to have been for dissemination of the video footage "to a member of the public," not for engaging in the altercation depicted in the video.  (Doc. 155-11 at 16-17.)

iii.   <u>Analysis</u>

C.L.'s negligent supervision claim fails.  As an initial matter, Defendants have proffered significant evidence that, despite some disciplinary infractions, Officer Grossman was seen as a competent officer by his supervisor, was respected by others in his department, and had earned several awards for his work.  This evidence, to be clear, does not warrant summary judgment by itself, but it does an important backdrop for C.L's proffered evidence.  *Cf. Vasquez*, 2006 WL 1147716 at *5 ("The City further contends that there is substantial evidence that Officers Jones and Kincannon were fit for their positions because they completed the Arizona Law Enforcement Academy and subsequent field training to become City of Phoenix police officers.  This evidence does not entitle the City to judgment as a matter of law.") (citation omitted).  C.L.'s evidence shows that, although Officer Grossman committed some infractions involving misconduct similar to the type of misconduct alleged in this case (*i.e.,* excessive force and other Fourth Amendment violations), those infractions occurred more than five years before this incident and Officer was placed on a PIP in response to them, which he successfully completed.   Other infractions that occurred following the PIP had nothing to do with excessive force or seizures—one involved showing body camera footage to a civilian, another involved the use of profanity, and another "had something to do with [Officer Grossman leaving] a weapon or his gun belt unsecured in his cubicle."  (Doc. 167-4 at 258-59.)

On this record, there is no evidence from which a reasonable jury could infer that the City, Lieutenant Arlak, or Chief Hall knew or should have known that Officer Grossman would be involved in an incident like the one at issue here, which involves allegations of excessive force, an unlawful seizure, and the misperception of a disability.  Second Restatement § 213 cmt. d ("Liability results . . . not because of the relation of the parties, but because the employer *antecedently had reason to believe* that an undue risk of harm would exist because of the employment.  The employer is subject to liability only for such harm as is within the risk.  If . . . the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee

*which the employer had reason to suppose would be likely to cause harm*.") (emphases added). *Cf. Pauna v. Swift Transp. Co. of Ariz., LLC*, 2021 WL 836859, *7 (D. Wyo. 2021) ("Mr. Brownell's prior misdemeanors, both of which were unrelated to assault and battery and were several years in the past, did not reasonably put Swift on notice that it had a legal obligation to supervise Mr. Brownell in an effort to prevent him from physically attacking Mr. Pauna or other members of the public."); *Breland v. City of Centerville*, 2008 WL 2233595, *6 (M.D. Ga. 2008) (finding lack of causal connection for negligent hiring and retention claim because the employee's "record, in its totality, suggest[ed] that he had a bad attitude, a surly and rude demeanor, a propensity to rash decisions, and an excessive love of the chase" but there was no "evidence of a single incident involving physical abuse of a subject"); *Dortch v. Fowler*, 2007 WL 1297122, *3 (W.D. Ky. 2007) (granting summary judgment on negligent retention/entrustment claim because "two prior incidents [were] so dissimilar to the facts of [the] case that no one could or ought to have anticipated . . . [a] different and serious collision"). *Compare Couick v. Morgan*, 2010 WL 5158206, *8 (S.D. Ga. 2010) (allegations of "verbal assaults" a month before alleged employment retaliation "should have put Defendants on notice that [a supervisor] had a tendency to react emotionally" and "[r]etaliation is a reasonably foreseeable consequence for any boss who finds her employee has complained about her, but especially likely if that boss has a tendency to react emotionally").

Nor has C.L. met his burden of showing that the City, Lieutenant Arlak, or Chief Hall failed to appropriately respond to the prior incidents involving Officer Grossman. The evidence in the record shows that Officer Grossman was disciplined for every infraction put forth by C.L. as evidence of his incompetence. No reasonable jury would find that the City, Lieutenant Arlak, or Chief Hall failed to exercise their supervisory duties. *Krieg*, 2015 WL 12669893 at *10 ("[T]he plaintiff must show that the defendant . . . 'failed to adequately discharge his duty to supervise, and . . . thereby contributed to the cause of the accident.'") (quoting *Boomer v. Frank*, 993 P.2d 456, 461 (Ariz. Ct. App. 1999)). *Compare Purcell v. Zimbelman*, 500 P.2d 335, 343-44 (Ariz. Ct. App. 1972) ("We believe it

1    reasonably probable to conclude that *had the hospital taken some action against Dr.*
2    *Purcell*, whether in the form of suspension, remonstration, restriction, or other means, the
3    surgical procedure utilized in this case would not have been undertaken by the doctor and
4    Mr. Zimbelman would not have been injured.") (emphasis added).

5                              b.      **Negligent Training**

6            To "prevail on a negligent training claim, a plaintiff must show a defendant's
7    training or lack thereof was negligent and that such negligent training was the proximate
8    cause of a plaintiff's injuries." *Guerra v. State*, 323 P.3d 765, 772 (Ariz. Ct. App. 2014),
9    *vacated on other grounds*, 348 P.3d 423 (Ariz. 2015). Importantly, "[a] showing of an
10   employee's incompetence is not necessarily enough; the plaintiff must also present
11   evidence showing what training should have been provided, and that its omission
12   proximately caused the plaintiff's injuries." *Id.* at 772-73.

13           Defendants are entitled to summary judgment on the negligent training claim for
14   two independent reasons. First, there is no evidence that Defendants' training efforts fell
15   below the applicable standard of care. Plaintiffs' expert on this issue, Bart T. Barta,
16   admitted during his deposition that he wasn't "aware of any national standard" that "every
17   single law enforcement agency must provide autism training in order to meet that standard
18   of care." (Doc. 155-7 at 13, 16-18.) Indeed, when asked to identify the source of the
19   applicable "standard of care on training," Barta conceded that "I can't find a professional
20   standard that I can point directly to." (*Id.* at 18.) Instead, Barta merely stated that providing
21   autism training would be considered a "best practice[]." (*Id.*) As courts have recognized,
22   such testimony is insufficient to establish the applicable standard of care in a negligence
23   action. *See, e.g.*, *MCI Commc'ns, Inc. v. Maverick Cutting & Breaking LLC*, 374 F. Supp.
24   3d 789, 808 (D. Minn. 2019) ("MCI has not presented evidence from which a jury could
25   decipher the industry standard of care applicable to a saw cutter. MCI's expert, Peterson,
26   offers several opinions as to industry best practices for saw cutters. But . . . industry best
27   practices are not industry standards of care. Indeed, industry best practices are aspirational,
28   generally requiring a higher standard of care than the industry standard of care.") (citation

omitted); *Nickolas v. Structured Asset Mortg. Inv. II Tr. 2006-AR8*, 2013 WL 11826532, *2 (D. Ariz. 2013) ("Nickolas does not provide authority stating conduct contrary to 'best practices guidelines' supports a negligence claim."); *Somerville ex rel. Somerville v. United States*, 2010 WL 2643533, *5 n.9 (M.D. Fla. 2010) ("The Court disagrees with Plaintiff's contention that Dr. Coady deviated from the standard of care by not following 'best practices' guidelines.  The standard of care is not equivalent to 'best practices.'"); *Ewans v. Wells Fargo Bank, N.A.*, 389 F. App'x 383, 390 (5th Cir. 2010) ("Negligence law is concerned with reasonable practices, not best practices.").

Nor may C.L. rely on Defendants' expert, Brian Herritt, to establish the standard of care (or a breach thereof).  Herritt expressly declined to provide an opinion on whether Officer Grossman "receive[d] adequate training in this particular case" (Doc. 167-6 at 13) and did not provide any opinion as to the standard of care.[14]  On this record, there would be no point in holding a trial.  *See, e.g., Gleason v. Garda CL West, Inc.*, 2019 WL 8226385, *9 (D. Ariz. 2019) ("Without identifying the industry training standard or disclosing an expert to opine on the applicable standard of care that Garda must follow and allegedly breached through its training practices, Ms. Gleason has not identified or presented evidence from which a jury could find that Garda negligently trained Mr. Holzwordt."); *Debruyn v. Hernandez*, 2019 WL 2359247, *5 (D. Ariz. 2019) ("[W]ithout establishing the relevant standard of care, Plaintiffs' arguments fall short of demonstrating negligent training."); *Contreras v. Brown*, 2019 WL 1980837, *6 (D. Ariz. 2019) ("[W]ithout

---

[14]   Admittedly, Herritt testified that he believed "all police departments should have training on autism" and stated that, if the Buckeye Police Department had come to him in June 2017 and asked if its training on "interactions between law enforcement and autism" was sufficient, he would answer "No, it's not." (Doc. 167-6 at 4, 7-8.)  Nevertheless, as with Barta's testimony about "best practices," Herritt's testimony on these points is insufficient to meet C.L.'s burden—saying a defendant "should" have done something is not the same thing as saying the defendant's failure to do so fell below the standard of care. *See, e.g., Robson v. Tinnin*, 911 S.W.2d 246, 248 (Ark. 1995) ("Quite simply, a statement that a dentist should have given a particular treatment or taken a particular course of action is not the equivalent of stating the applicable standard of care and breach thereof."); *Monroe v. Blevins*, 185 So.3d 419, 422 (Miss. Ct. App. 2016) ("[T]he fact that something 'should have' been done is not equivalent to stating that it would have been done by a minimally competent physician[] in the same specialty or general field of practice throughout the United States . . . .") (second alteration in original) (internal quotation marks omitted).

- 55 -

identifying any regulation or industry standard, Plaintiffs are unable to show how Defendant Legacy's alleged lack of training was negligent."); *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 815-16 (Ariz. 1987) ("Where . . . the alleged lack of care occurred during the professional or business activity, the plaintiff must present expert witness testimony as to the care and competence prevalent in the business or profession.").

Second, the negligent training claim also fails due to a lack of evidence of causation. In his deposition, Officer Grossman testified that, even in "light of the training that [he has] received since [the incident with C.L.]," he "would have probably done the same thing [he] did that day."  (Doc. 155-3 at 18.)  In response, C.L. cites a video entitled "Autism Law Enforcement First Responders," created by the Autism Society of Central Texas, which Assistant Chief Sanders viewed in June 2017 (a month before the incident) and evidently "sent out to roll call training in July of 2017."  (Doc. 167-7 at 44-45.)  This video contains information about encounters between individuals with autism and first responders, how autistic individuals may act when confronted by first responders, and how first responders can appropriately and safely engage with autistic individuals.  (Doc. 167-7 at 104 [video on USB drive filed with the Court]; *id.* at 49 ["Q. Okay.  So just so we have a [somewhat] clear record, the video said that it endeavors to give some protocols and overview to law enforcement in dealing with people that have autism to avoid a deadly incident [from] occurring, right?  A. Yes."].)  The video discusses, for example, that 1 in 68 children are diagnosed with autism, that boys are four times more likely than girls to be diagnosed with autism, and that individuals with mental disabilities are seven times more likely to come into contact with law enforcement.  (*Id.* at 52, 54, 104.)  Although Sanders viewed the video in June 2017, he "didn't send it out" that month, choosing instead to send another training video because there usually wasn't "more than one roll call training video out per month."  (*Id.* at 55-56.)

The Court agrees with Defendants that C.L. has not identified how this training

1    video, even if Officer Grossman had viewed it before the incident,[15] would have changed

2    the outcome.  Significantly, the training video does not contain any discussion of stimming

3    behaviors that would have put Officer Grossman on notice that C.L.'s behavior was

4    attributed to autism, as opposed to an illegal inhalant.  To the extent C.L. argues this video

5    put Sanders on notice to institute specific autism training (Doc. 167 at 6), C.L. has not

6    identified any additional training the City could have offered that would have changed the

7    outcome of the events in question.  *Guerra*, 323 P.3d at 772-73 ("[T]he plaintiff must also

8    present evidence showing what training should have been provided, and that its omission

9    proximately caused the plaintiff's injuries.").

10          During oral argument, C.L.'s counsel also identified a CNN article entitled "Police

11   trained on how to respond to people with autism" (Doc. 167-7 at 106-08) as potential

12   evidence of causation.  This article discusses the efforts of a nonprofit organization in

13   Virginia to "train first responders, including law enforcement, medical and judicial

14   personnel about how to respond to people with autism." (*Id.* at 107.)  The article notes

15   that, in the training offered by this organization, first responders "learn to recognize certain

16   restrictive and repetitive behaviors associated with autism, and learn about recommended

17   responses." (*Id.*)  Notably, this is the article's only mention of repetitive behaviors.  It does

18   not describe what such behaviors would look like or how they would manifest.  Thus, even

19   if the training mentioned in this article had been provided to Officer Grossman before July

20   2017, it is pure speculation to suggest it would have caused Officer Grossman to recognize

21   that C.L. was stimming.  A lone mention of "repetitive behaviors" does not create a genuine

22   dispute of material fact that the training offered by the Virginia organization would have

23   changed the outcome of the encounter between Officer Grossman and C.L.

24          …

25   _____

26   [15]    Officer Grossman testified that he had seen a training video about "missing kids and
     elopement" before the incident (Doc. 167-4 at 114-15) but didn't see a second video "more
27   about incidents in which autistic people have been harmed and having safe encounters
     between law enforcement and autistic people" (*id.* at 126-27.)  It is unclear whether this
28   "second video" is the video sent out in July 2017 by Sanders.  Irrespective of the timing of
     Officer Grossman's review, C.L. has still failed to show that Officer Grossman's review or
     lack of review would have made any difference.

1    Accordingly,

2    **IT IS ORDERED** that:

3    1.    Defendants' motion for summary judgment (Doc. 155) is **granted in part**

4  **and denied in part**. Defendants Lieutenant Arlak and Chief Hall are dismissed from this

5  case.

6    2.    C.L.'s motion for partial summary judgment (Doc. 158) is **denied**.

7    Dated this 25th day of August, 2021.

8

9

10   _____

     Dominic W. Lanza

11   United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28